In these consolidated appeals, P.H. ("the mother") and C.C. ("the father") appeal from the juvenile court's judgment terminating their parental rights to their nine-year-old daughter, C.L.C. ("the child"). We reverse the juvenile court's judgment as to the mother (case no. 2040483) and remand the cause for further proceedings, and we affirm that court's judgment as to the father (case no. 2040490).
The record indicates that in March 2001 the Madison County Department of Human Resources ("DHR") filed a dependency petition as to the child and her two half brothers after her half brothers accused the father of physically and sexually abusing the boys.[1] After DHR filed the petition, the half brothers were placed in the home of their maternal grandmother and the child soon began living in the home of her paternal grandmother. Although the record does not specifically indicate the ground for the child's removal from the parents' home, the juvenile court's judgment terminating the mother's and the father's parental rights does disclose some limited information concerning the child's removal. That judgment states, in pertinent part, the following:
 "While the evidence is not clear and the facts not agreed upon by all, [the child] was removed when an allegation of physical abuse was investigated. The official version of the incident was that [the child] claimed that her parents had whipped her, and thus the physical abuse allegation coupled with the sexual abuse of the boys called for her removal. The report of the worker clearly stated that no marks were found on the child when the abuse allegations came to light."
In September 2001, after holding a hearing, the juvenile court adjudged the child and her half brothers to be dependent and placed them in DHR's custody. In that order, the juvenile court disapproved of the child's placement in the paternal grandmother's home and directed that the child be removed from her home and placed in foster care. That court also prohibited the mother from allowing the father unsupervised contact with the child and her half brothers and directed that the mother not allow the father to be present during any time that the child and her half brothers were at the mother's residence.
The record indicates that shortly after entering foster care the child began displaying significant behavioral problems, including oppositional behavior and enuresis, i.e., bed-wetting. Although there may have been other problems related to at least 2 of the child's foster-care placements, the child's behavioral problems in large part prompted the child's placement in at least 5 different foster homes within 16 months. In the latter part of May 2003, DHR recommended that the child be reunited with her mother and provided for in-home parenting assistance by the Family Options organization. However, within two months of that placement, the child's case was assigned to a different juvenile-court judge, who ordered that the child be removed from the mother's home and placed in a therapeutic foster home.[2]
After the child reentered foster care, the child had to be moved to at least two more foster-care placements. The child's most recent move, which occurred after the child had remained in foster care for approximately *Page 528 
three years, occurred just three days before the juvenile court held its first termination hearing in April 2004, one month after DHR had filed a petition to terminate the mother's and the father's parental rights. The juvenile court, after conducting hearings in April 2004 and October 2004, terminated the parental rights of the mother and the father in January 2005. Both parents filed postjudgment motions; those motions were denied by the juvenile court. Both parents appeal.
When a trial court's decision to terminate parental rights is based on evidence presented ore tenus, this court will presume that the judgment is factually correct, and we will reverse the trial court only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong.M.H.J. v. State Dep't of Human Res., 785 So.2d 372, 375
(Ala.Civ.App. 2000).
The statutory grounds upon which a court can order the termination of parental rights are set forth in Ala. Code 1975, § 26-18-7(a), which provides, in pertinent part, the following:
 "(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
 "(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
 "(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
 "(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
 "(4) Conviction of and imprisonment for a felony.
 "(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
 "(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
 "(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
 ". . . .
 "c. A felony assault or abuse which results in serious bodily injury to the surviving child or another child of that parent. . . .
 "(8) That parental rights to a sibling of the child have been involuntarily terminated." *Page 529 
If a child is not in the physical custody of his or her parent, the trial court "shall also consider such circumstances as whether the parents have provided material needs for the [child], whether the parents have maintained regular, scheduled visits with the [child] and whether the parents have adjusted their circumstances to meet the needs of the [child] according to agreements reached administratively or judicially." L.G.v. State Dep't of Human Res., 603 So.2d 1100, 1101-02
(Ala.Civ.App. 1992); see also Ala. Code 1975, §26-18-7(b).
In cases such as this, where a nonparent is the petitioner, the trial court's determination is governed by the principles set forth in Ex parte Beasley, 564 So.2d 950, 954 (Ala. 1990):
 "The two-prong test that a court must apply in a parental rights termination case . . . consists of the following: First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in § 26-18-7. Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered. (. . . [I]f a non-parent, including the State, is the petitioner, then such a petitioner must meet the further threshold proof of dependency.)"
The best interests of the child lie "at the heart of every proceeding to terminate parental rights." L.G.,603 So.2d at 1101.
 The Mother (case no. 2040483)
The mother contends that DHR failed to prove by clear and convincing evidence that no viable alternatives existed to the termination of her parental rights. Although we are aware of the presumption accorded a trial court's judgment when it has heard evidence ore tenus, after reviewing the record in this case, we are compelled to conclude that the decision of the juvenile court to terminate the mother's parental rights is not supported by clear and convincing evidence.
The record indicates that the mother, who is herself a former foster child, has been diagnosed as having a full-scale intelligence quotient (IQ) of 80 and is classified as being in the borderline range of intellectual functioning. Although the mother dropped out of high school in the eighth grade, it appears that she worked for quite some time at a pizzeria restaurant until March 2004, shortly after DHR filed its termination petition. At that time, the mother obtained employment as a lab technician making dentures at a dental laboratory. Although the mother previously had been required to work nights and weekends at the restaurant, the mother's new employment allowed her to work during the weekdays. In addition, the mother received primary health-care benefits as a part of her compensation package. The record reflects that by October 2004 the mother had maintained her new employment as a lab technician for approximately seven months. In addition, she had purchased a vehicle for transportation and had continued visiting with the child on a weekly basis in her home.
Although the record indicates that the DHR caseworkers who had initially investigated this case did not testify, a subsequently assigned caseworker, Djuana Threatt ("the caseworker"), testified that she had been assigned to the child's case in June 2001 and continued to be the assigned caseworker at the termination hearing. The caseworker testified that DHR's primary concerns with respect to the mother were (1) the mother's ability to maintain an independent life away from *Page 530 
the father, and (2) the mother's parenting capabilities.
With respect to DHR's first concern, the caseworker admitted that the mother had obtained adequate housing in a subsidized apartment complex upon DHR's request and that the mother had continued to live there for approximately four years. Although the caseworker testified that DHR had continuing concerns regarding possible contact between the mother and the father, the caseworker admitted that DHR had no evidence to justify that concern other than that the father had failed to supply the caseworker with a home address and that DHR had received a report on at least one occasion that the father had been seen driving an automobile near the mother's residence.
With respect to DHR's second concern, the caseworker stated that a Family Options parenting-assistance worker, who had spent approximately 60 hours in the mother's home after the child had been temporarily reunited with the mother, had expressed concerns regarding the mother's lack of receptivity to the parenting information supplied by the parenting-assistance worker and the mother's apparent lack of discipline as to the child. When the parenting-assistance worker ended her services, she recommended that another worker be placed in the home on a long-term basis to help the mother implement the parenting skills that she had learned; however, the caseworker admitted that no other in-home parenting services were later offered to the mother.
The caseworker also testified that mental-health counseling had been provided to both the mother and the child after the child's removal and that the mother appeared to have benefited from the therapy. The caseworker added that she was aware that the mother had attended and had successfully passed a DHR-approved parenting-skills program in the weeks before the trial. Although the caseworker opined that she believed that it was in the best interests of the child for the mother's parental rights to be terminated, she admitted that the mother and the child appeared to have bonded, that the mother had consistently visited the child on a weekly basis, that the caseworker had no concerns about the adequacy of the mother's home, and that the mother had complied with all of DHR's requests.
Dr. Linda Mastromonico, a licensed professional counselor who counseled both the mother and the child ("the counselor"),[3]
characterized the child as being a strong-willed and guarded child who displayed passive-aggressive behaviors in adapting to her environment. Although the counselor stated that the mother had expressed a great deal of negativity towards DHR in initial counseling sessions, the counselor stated that in later sessions the mother's negativity had lessened and the mother had begun encouraging the child to "open up" and deal with her problems. The counselor testified that the child appeared to have a separation-anxiety disorder and that that disorder was due, at least in part, to the fact that the child was not living with her mother. The counselor testified that although she did have some concerns regarding the mother's ability to protect and enforce rules, she believed that the mother had the tools to become an effective parent.
Dr. Lois Pope, a psychologist ("the psychologist"), testified in a deposition that the mother's psychological evaluation had revealed that she had a depressive disorder with antisocial and schizoid traits. *Page 531 
The psychologist testified that the testing conducted on the mother showed "definite areas of deficit" in her parenting skills, and the psychologist opined that the mother would likely continue to experience substantial difficulty in managing the child's behavior. However, the psychologist admitted that the mother could be taught parenting skills and that the mother's parenting deficits could be addressed by counseling and individual therapy.
The mother testified that she lived alone in an apartment that she had rented shortly after she had ended her relationship with the father at DHR's request. She denied being in a current relationship with the father and denied that he had ever lived with her at her apartment. The mother asserted that she had changed jobs at DHR's request in order to work more regular daytime hours. In addition, she stated that she earned approximately $7 per hour at her new job and that she had no difficulty paying her bills. The mother testified that if the child were to be reunited with her the mother's new job would allow her to be off work by the time the child would get home from school. Additionally, the mother stated that she had checked with her employer and that she could provide dependent health-care coverage for the child through her employment. The mother testified that she had provided DHR, at its request, a "parenting plan" but that she had received no feedback from DHR about that plan. She also stated that she believed that she had benefited from the counseling sessions that she had attended, and she expressed a willingness to take any further classes required by DHR.
"This court has consistently held that the existence of evidence of current conditions or conduct relating to a parent's inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence."D.O. v. Calhoun County Dep't of Human Res.,859 So.2d 439, 444 (Ala.Civ.App. 2003); see also T.H. v. State Dep'tof Human Res., 740 So.2d 1089, 1092 (Ala.Civ.App. 1998); and Bowman v. State Dep't of Human Res.,534 So.2d 304, 306 (Ala.Civ.App. 1988). Arguably, the mother's concerted efforts in changing her circumstances could be characterized as being late; however, the fact that the mother, who is a former foster child of less-than-average intelligence and means and who has a limited education and almost no familial resources, has made significant progress in rehabilitating herself should not be ignored. We note that a court should terminate parental rights in only the most egregious circumstances because those rights, once terminated, cannot be reinstated. V.M. v.State Dep't of Human Res., 710 So.2d 915, 921
(Ala.Civ.App. 1998); and S.M.W. v. J.M.C.,679 So.2d 256, 258 (Ala.Civ.App. 1996).
Therefore, in light of the foregoing, we conclude that the termination of the mother's parental rights was premature and is not supported by the evidence contained in the record on appeal. We therefore reverse the judgment of the juvenile court terminating the mother's parental rights and remand the case for further proceedings consistent with this opinion.
 The Father (case no. 2040490)
The father argues three issues on appeal; we will address each in turn. The father first contends that DHR failed to present clear and convincing evidence that the child remained dependent after the juvenile court had removed the child from the mother's home in August 2003 and returned the child to foster care. In order to adjudicate a child dependent, a juvenile court must determine that one or more of *Page 532 
the circumstances set forth in Ala. Code 1975, § 12-15-1(10), which defines the term "dependent child," has been met. Under that statute, the term "dependent child" includes a child:
 "d. Whose home, by reason of neglect, cruelty, or depravity on the part of the parent, parents, guardian, or other person in whose care the child may be, is an unfit and improper place for the child; or
 ". . .
 "f. Who is in a condition or surroundings or is under improper or insufficient guardianship or control as to endanger the morals, health, or general welfare of a child; or
 ". . .
 "m. Who for any other cause is in need of the care and protection of the state; and
 "n. In any of the foregoing, is in need of care and supervision."
As has been stated previously, before entering foster care, the child's half brothers had accused the father of assaulting and sexually abusing them in 1999 while the boys and the child were living with the mother. After an investigation, the father was subsequently indicted on charges of having committed sexual abuse and physical abuse against he boys. As a result of the father's plea bargain to two counts of domestic violence in the third degree,[4] the father was sentenced to two consecutive terms of imprisonment of 180 days for each count and he was placed on 2 years' probation 2 months before the first hearing in this case. In addition, he was ordered not to have further contact with the child victims.
Although we are unable to ascertain from the record whether the father had completed his prison sentence at the time of the entry of the juvenile court's judgment, we note that even if the father had completed his prison sentence, he, nonetheless, would still be on probation. The father's admitted physical misconduct toward others who were living in the same home as the child endangered the child's health and safety and necessitated the child's removal from that environment. In addition, there is no evidence in the record to suggest that the father's significant behavioral faults, which prompted the child's initial removal from the home, did not continue to exist at the time of the juvenile court's January 2005 judgment terminating his parental rights.
The juvenile court's judgment specifically determined that that court had found "by clear and convincing evidence, material and relevant in nature, that the child remained] . . . a dependent child." After closely reviewing the record, we conclude that the documentary and testimonial evidence adduced at trial supports the juvenile court's finding of dependency.
The father next argues that there was insufficient evidence to show that no viable alternatives existed to termination of his parental rights. Specifically, he argues that DHR failed to prove that there were no suitable relatives who were willing to provide a permanent placement for the child. The father argues that the home of the child's paternal grandmother was a viable alternative resource for permanent *Page 533 
placement. However, the record reveals that in September 2001 the juvenile court removed the child from the paternal grandmother's home and placed her in foster care because it specifically disapproved of the child's placement with the paternal grandmother. In rejecting that placement, the juvenile court's order stated the following, in pertinent part:
 "Based upon [the paternal grandmother's] history with her own children and her present relationship with her husband, the court is of the opinion that the continued placement of [the child with the paternal grandmother] would not be in her best interest and that it, in fact, poses a real and present danger of harm to her."
Although the father would not co-operate with DHR in providing an address for himself, he, nonetheless, apparently received mail sent to him at the paternal grandmother's address. If the father resided with the paternal grandmother (and we note that there is no evidence in the record to contradict that assumption),[5] the juvenile court could have drawn the logical inference that placing the child with the paternal grandmother would, in essence, be the same as leaving the child with the father. "The trial court must consider the best interest of the child when looking at less drastic alternatives" to the termination of parental rights. Haag v. CherokeeCounty Dep't of Pensions Sec, 489 So.2d 586, 588
(Ala.Civ.App. 1986). Moreover, there is no evidence in the record to indicate that the paternal grandmother ever offered her home as a permanent placement for the child. Thus, the juvenile court could have correctly concluded that placing the child in the home of the paternal grandmother was not a viable alternative.
Lastly, the father contends that the juvenile court's judgment terminating his parental rights was not supported by clear and convincing evidence. The father argues that none of the conditions listed in Ala. Code 1975, § 26-18-7(b), which enumerates the factors that a trial court must consider in determining whether to terminate parental rights, were present in his case. Section 26-18-7(b) provides the following:
 "(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
 "(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
 "(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private care agency, and agreed to by the parent.
 "(3) Failure by the parents to maintain consistent contact or communication with the child.
 (4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
First, we note that the considerations set forth in Ala. Code 1975, § 26-18-7(b), do not compose an exhaustive list. However, we are not persuaded on this record that the conditions set out in § 26-18-7(b) *Page 534 
do not apply to the father, or that he has made substantial progress toward addressing the conditions set forth in that statute. Although it appears that the father did visit with the child, a previous court order had directed that those visits be supervised by DHR because of pending sexual-and-physical abuse charges against him. We note that the caseworker testified that during those supervised visits more inter-action occurred between the child and the paternal grandmother than between the child and the father. Although the father contends in his appellate brief that he always provided for the material needs of the child, the caseworker testified that the father had not paid any child support during the time that the child had remained in foster care.
With respect to the father's argument that he adjusted his circumstances to meet the needs of child, we find little evidence to support his argument. At the time of the termination hearing, the father had yet to supply the caseworker with a verifiable physical address despite numerous requests. The caseworker testified that she had experienced difficulty in contacting the father on several occasions. Although the caseworker had previously been able to contact the father when he worked with the mother at the pizzeria restaurant, the caseworker knew of no way to contact him after he switched jobs. In addition, the caseworker stated that she had no knowledge of a personal telephone number for the father and that she did not possess any knowledge concerning the father's new employment.
The father's psychological evaluation reveals a history of anger-management problems, domestic violence, and indications of substance abuse. Indeed, the father admitted to a psychologist who conducted an evaluation of him that he had engaged in verbal abuse of his family, with profanity, on a daily basis. Although the father may have attended some counseling sessions that had been provided by DHR to assist the father in dealing with his anger-management problems, the record does not contain any evidence indicating that the father was able to incorporate any of the strategies that he may have learned during those counseling sessions into his daily life.
Despite the father's arguments to the contrary, the record does contain clear and convincing evidence in support of the juvenile court's decision to terminate his parental rights. We note that the father failed to provide DHR with even the most rudimentary information that would have enabled that agency to make a reasonable evaluation as to his ability to assume custody for the child. Moreover, the fact that the father has pleaded guilty to having committed domestic violence in the third degree (a misdemeanor) in connection with the child's half brothers is of grave concern. We note that the juvenile court's judgment terminating the father's parental rights specifically found that the father was unfit; that he was unwilling to change his habits; that he was non-rehabilitated; and that the "safety and welfare of any child would be threatened in his care."
Based upon the record on appeal, we conclude that the juvenile court's judgment terminating the parental rights of the father is supported by clear by convincing evidence and is not plainly and palpably wrong. Therefore, that portion of the juvenile court's judgment terminating the parental rights of the father is affirmed.
2040483 — REVERSED AND REMANDED.
2040490 — AFFIRMED.
CRAWLEY, P.J., and THOMPSON, MURDOCK, and BRYAN, JJ., concur.
[1] A copy of the dependency petition does not appear in the record.
[2] The record is unclear as to the specific reason for the juvenile court's removal of the child from the mother's home on this occasion.
[3] The record indicates that at the time of the trial, the counselor had conducted more than 70 therapy sessions with the child over approximately 2 years.
[4] Section 13A-6-132(a), Ala. Code 1975, provides that "[a] person commits domestic violence in the third degree if the person commits the crime of assault in the third degree pursuant to Section 13A-6-22 . . . and the victim is a current or former spouse, parent, child, any person with whom the defendant has a child in common, a present or former household member, or a person who has or had a dating or engagement relationship with the defendant."
[5] The father did not testify at trial. *Page 535