BRYAN, Judge.
The Montgomery County Department of Human Resources (“DHR”) appeals from a judgment of the Montgomery Juvenile Court refusing to terminate the parental rights of W.J. (“the father”) to his child, S.J. (“the child”), a girl born in June 2006. We reverse and remand with instructions.
The record on appeal establishes the following. DHR became involved with the child and M.P. (“the mother”) on July 24, 2006, when DHR received a report indicating that the mother was using controlled substances and that the child’s well-being was in danger. On July 25, 2006, the juvenile court issued a pick-up order for the child. DHR filed a dependency petition on July 27, 2006, based on the mother’s history of drug use, her inattentiveness to the child’s medical needs, and because she was suspected of abusing her other children. The juvenile court found the child dependent on August 28, 2006, and it awarded custody of the child to DHR. DHR subsequently placed the child in foster care.
The father filed a petition seeking custody of the child on September 7, 2006. The father’s paternity was established in January 2007. On June 25, 2007, the juvenile court held a permanency hearing and determined that the child remained dependent and that it was in the child’s best interest to remain in the temporary legal custody of DHR.
DHR filed a petition to terminate the parental rights of the mother and the father on August 17, 2007. On February 13, 2008, the paternal grandmother filed a petition seeking custody of the child.
The juvenile court heard ore tenus evidence on DHR’s petition to terminate the parental rights of the father and the mother, on the paternal grandmother’s petition for custody, and on the father’s petition for custody on March 17, 2008, May 5, 2008, August 18, 2008, and October 27, 2008.[1]
*688 On December 1, 2008, the juvenile court entered a judgment refusing to terminate the father’s parental rights. The judgment stated, in pertinent part:
“[T]he court is of the [ojpinion that the [fjather ... has demonstrated a willingness to exercise his parental responsibility. However, he has fallen short in fulfilling his responsibility. With good-faith assistance from [DHR], the court is of the [o]pinion that [the father] can work toward reunification with the ... [e]hild. Additionally, the court notes that the [p]aternal [g]randmother has also demonstrated a willingness to provide and care for the minor child. However, the court is unable to award custody to the [p]aternal [g]randmother at this time based upon positive drug tests and her refusal to comply with [DHR] requests for drug screens.”
The juvenile court entered an amended order in response to DHR’s motion to alter, amend, or vacate the juvenile court’s judgment, pursuant to Rule 59(e), Ala. R. Civ. P. The juvenile court again refused to terminate the parental rights of the father because the paternal grandmother was “willing to care for the ... child.” However, the final judgment as amended again failed to award custody of the child to the paternal grandmother.
At the March 2008 hearing, the father testified that he was a “rap” artist and that he had left New York and the possibility of a “record deal” so that he could return to Montgomery and seek custody of the child. Upon his return, the father moved into the paternal grandmother’s home and found a job with an automobile-auction company earning $6 per hour.
The father claimed that he did not complete the parenting classes at the Family Guidance Center that were recommended by DHR because the classes conflicted with his scheduled visitation with the child. He claimed that he had located a different parenting class that did not conflict with his schedule but that DHR did not find that class appropriate. The father later admitted that DHR had set up a special arrangement for him at the Family Guidance Center so that he could attend parenting classes during his lunch break.
The father admitted that he had provided no monetary support for the child, but he stated that he had bought her “clothes and shoes and stuff.” He stated that he earned approximately $800 a month driving cars for the automobile-auction company and that he had worked for the same employer for two years. He testified that he paid no rent and half of the utility bill for the paternal grandmother’s home. He stated that if he obtained custody of the child he would have to get a second job.
DHR introduced evidence indicating that the father had submitted to drug screens on January 9, 2007, and June 5, 2007; the first drug screen was positive for marijuana, and the second was positive for cocaine. The father admitted that he had smoked marijuana on March 8, 2007. He stated that the reason he tested positive for cocaine in June 2007 was because he had “touched it.” The father also admitted that he had refused to submit to drug screens on three or four occasions in 2006 and 2007.
The father admitted that he had failed to complete the drug-rehabilitation program at Lighthouse Counseling Center (“Lighthouse”) that DHR had recom *689 mended. The father testified that DHR had made special arrangements for him to arrive at Lighthouse late due to his work schedule. The father admitted that he could not pass a hair-follicle test on the day of the March 2008 hearing because he had “been around” someone smoking marijuana.
The father testified that he had scheduled visitation with the child every Tuesday for one hour. He stated that he was not scheduled to work on Tuesdays but that he would occasionally get called in to work after his visitation. The father stated that he had visited the child regularly throughout 2007, except for “a couple of days” that he was called in to work.
The father also stated that he had given DHR a list of relative resources that could take custody of the child and that the list was inclusive of everyone he thought could adequately care for the child. He admitted that he had not requested any services from DHR that DHR had failed to provide to him.
At the hearing in May 2008, Allison McNeil, a social worker with DHR, testified that DHR had held individualized service plan (“ISP”) meetings regarding the child on August 25, 2006, July 27, 2006, January 29, 2007, July 16, 2007, and December 20, 2007. McNeil stated that the father was required to submit to random drug screens, to attend parenting classes, to attend drug rehabilitation at Lighthouse, to submit to a psychological evaluation, to maintain employment, and to provide drug-free, safe, and stable housing for the child. McNeil stated that DHR had offered the father services to meet those goals, including visitation, parenting classes, drug treatment, transportation assistance, and a psychological evaluation, but that the father had not been compliant with all the goals set forth in the ISPs.
McNeil indicated that she had referred the father to parenting classes at the Family Guidance Center, but the father did not attend. After the father indicated that the parenting classes interfered with his schedule, McNeil made special arrangements with an instructor at the Family Guidance Center so that the father could meet with the instructor for parenting classes during his lunch break. The father was required to contact the instructor to set up appointments, but the father never did so. McNeil stated that the father did suggest another parenting class, but DHR did not approve of that class for the father because it was designed to counsel couples in conflict.
Although the father claimed in March 2008 that he was still employed at the automobile-auction company, McNeil testified that she had contacted the automobile-auction company to verify his employment, but, she said, a representative of the company had stated that the father no longer worked for the company and that his last paycheck had been issued on February 1, 2008. McNeil did not know if the father had maintained a job between February 2008 and the final hearing in October 2008.
At the May 2008 hearing, McNeil stated that the father had not visited the child since the prior hearing in March 2008. At the October 2008 hearing, McNeil testified that the father had visited the child on 38 occasions but had missed 55 scheduled visits with the child. DHR presented evidence indicating that the father had not visited the child from January 22, 2008, through May 27, 2008,[2] and that from May 27, 2008, through June 25, 2008, the father had visited the child on only one occasion. *690 As of October 27, 2008, the father had not visited the child since August 12, 2008.
McNeil stated that the father had failed to complete drug rehabilitation at Lighthouse. Records indicate that the father began substance-abuse treatment at Lighthouse on March 9, 2007. As corroborated by the father’s testimony, special arrangements were made by DHR with the staff at Lighthouse so that the father could arrive to the rehabilitation meetings late, in order to comply with his work schedule. However, by April 30, 2007, a report from Lighthouse indicated that the father’s attendance was unsatisfactory and that he was making no progress in his treatment. The father was scheduled to be discharged from the program on May 21, 2007. The father began treatment with Lighthouse again on June 13, 2007. However, by October 31, 2007, the father’s case had been closed due to the fact that the father’s attendance was unsatisfactory and because the father had made no further progress.
McNeil testified that DHR had made an effort to locate relative resources who could take custody of the child as an alternative to terminating the father’s parental rights. DHR investigated seven individuals, including the paternal grandmother. Only two of those relatives expressed an interest in adopting the child. McNeil referred the two individuals to her supervisor and suggested that they file petitions for custody of the child. McNeil attempted contacting both relatives for a followup, but her telephone calls were not returned by either relative.
DHR also considered custody with the paternal grandmother as a viable alternative to termination. The paternal grandmother testified that she had not been employed since 2007 and that she relied on approximately $618 a month in disability payments as income. She stated that she had recently moved into a home with her fiancé. DHR evaluated the paternal grandmother’s home that she shared with her fiancé and found that it was adequate to meet the needs of the child.
The paternal grandmother admitted that, prior to the first hearing in March 2008, DHR had requested that she submit to a drug screen on four occasions but that she had only taken one. She stated that DHR had informed her that a refusal to submit to a drug screen would be considered a positive drug screen. The drug screen that the paternal grandmother submitted to, in March 2008, indicated that she had used cocaine. She insisted that she was not a habitual drug user and that she had made “one mistake” by self-medicating with cocaine. However, the paternal grandmother submitted to a random drug screen on September 30, 2008, which was positive for cocaine. The paternal grandmother insisted that she did not use cocaine.
At the May 2008 hearing, the paternal grandmother testified that she had not missed any visits with the child since the prior court hearing in March 2008, but she later admitted that she had missed two visits. McNeil noted that despite the fact that the paternal grandmother had been given the opportunity to visit the child every week, the paternal grandmother had visited the child only 25 times between September 2006 and April 2008.
At the October 2008 hearing, DHR introduced an ISP report dated June 25, 2008, which recommended that the paternal grandmother attend parenting classes, submit to a psychological exam, remain drug-free, and complete intake counseling at Lighthouse. The report indicated that the paternal grandmother was present during the ISP meeting at which those recommendations were made. Yet, McNeil testified, the paternal grandmother had not fully complied with any of those *691 recommendations. The paternal grandmother stated that because she uses the public-transportation system, she would have had to walk approximately five miles to attend the psychological evaluation.
McNeil testified that she believed that the child would be in imminent danger if placed in the custody of the father or the paternal grandmother because both parties had demonstrated a lack of desire to cooperate with DHR by refusing to submit to drug screens requested by DHR and because of their positive drug-test results.
The child’s guardian ad litem submitted a report to the juvenile court that recommended that the father’s parental rights be terminated. The guardian ad litem stated that the father and his family were in “denial” and that he believed that they had “[grown] comfortable with [DHR’s] care.” The guardian ad litem also stated that he recommended termination of the father’s parental rights because DHR had given the father the opportunity to rehabilitate himself and he simply had not taken advantage of that opportunity.
“This court affords no presumption of correctness to the juvenile court’s application of the law to the facts. See Brooks v. Brooks, 991 So.2d 293, 300 (Ala.Civ.App.2008). Furthermore,
“ ““ “[t]he appellate courts do not sit in judgment of the facts, and [they] review the factfinder’s determination of facts only to the extent of determining whether it is sufficiently supported by the evidence, that question being one of law.” ’ ” Ex parte T.V., 971 So.2d 1, 9 (Ala.2007) (quoting Hinds v. Hinds, 887 So.2d 267, 272-73 n. 2 (Ala.Civ.App.2003), quoting in turn Curtis White Constr. Co. v. Butts & Billingsley Constr. Co., 473 So.2d 1040, 1041 (Ala.1985)).’
“J.W.M. v. Cleburne County Dep’t of Human Res., 980 So.2d 432, 433 (Ala.Civ.App.2007).”
Montgomery County Dep’t of Human Res. v. C.R., 4 So.3d 1162, 1169 (Ala.Civ.App.2008).
The evidence establishes that the child was dependent pursuant to § 12-15-1(10), Ala.Code 1975.[3] The juvenile court had made two prior determinations in this case finding the child dependent; the first determination was made on August 28, 2006, and the second was made on June 25, 2007. The mother voluntarily relinquished her parental rights by a signed agreement dated September 8, 2008. The father withdrew his petition for custody of the child on August 18, 2008. Further, the juvenile court refused to grant the father custody of the child, noting that he had “fallen short in fulfilling his responsibility” to the child. The juvenile court also refused to grant custody of the child to the paternal grandmother because she had tested positive for cocaine on two occasions and had refused to submit to drug tests requested by DHR on three occasions. After considering the evidence in the record, the evidence supports a determination that the child is dependent.
Pursuant to Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990), after it has been determined that the child is dependent, a juvenile court is then required to determine whether there exists a viable alternative to the termination of parental rights. *692 In this case, the juvenile court refused to terminate the father’s parental rights because the paternal grandmother was “willing to care for the child.” However, as stated above, the juvenile court was unwilling to grant immediate custody of the child to the paternal grandmother because of her illicit drug use and her “refusal to comply with [DHR’s] requests for drug screens.” On appeal, DHR argues that the juvenile court erred in failing to terminate the father’s parental rights because clear and convincing evidence demonstrated that no viable alternative to terminating the father’s parental rights existed. We agree.
The juvenile court, in essence, found that the father’s parental rights should not be terminated because the paternal grandmother might become a viable alternative at some point in the future. Becoming a viable alternative at some point in the future is not the proper standard; an individual is a viable alternative to termination if the individual is presently fit and capable of taking custody of the child. See T.B. v. Cullman County Dep’t of Human Res., 6 So.3d 1195, 1204 (Ala.Civ.App.2008) (“One of the ‘viable alternatives’ to termination of parental rights as set out in the parental-rights-termination statute is placement of the child with a fit and willing relative qualified to receive and care for the child when that placement serves the best interests of the child.” (emphasis added)). See also V.M. v. State Dep’t of Human Res., 710 So.2d 915, 921 (Ala.Civ.App.1998) (requiring DHR to consider a viable alternative to termination in light of her present circumstances).
DHR excluded the paternal grandmother as a viable alternative because the paternal grandmother had refused three drug screens and had submitted to one drug screen that showed that she had used cocaine.[4] At the May 2008 hearing, the paternal grandmother professed that her use of cocaine was a one-time “mistake” and that she would never do anything to lose the child. However, the paternal grandmother again tested positive for cocaine after a random drug screen in September 2008. In refusing to grant custody of the child to the paternal grandmother, the juvenile court implicitly found that the paternal grandmother was unfit to take custody of the child and was, therefore, not a viable alternative to terminating the father’s parental rights.
DHR also argues on appeal that the juvenile court erred in failing to terminate the father’s parental rights despite clear and convincing evidence demonstrating that the father was unable or unwilling to discharge his responsibilities to and for the child. The original judgment of the juvenile court recognized that the father had “fallen short in fulfilling his [parental] responsibility.” The juvenile court further stated that it believed that the father could be reunited with the child after “good-faith assistance from [DHR].” This finding is unsupported by the evidence. The juvenile court heard undisputed evidence establishing (1) that the father had failed to attend parenting classes as requested by DHR, (2) that the father had failed to complete drug rehabilitation as requested by DHR, and (3) that the father had failed to maintain consistent visitation with the child as the case progressed. The juvenile court erred in implicitly determining that DHR had not produced clear and convincing evidence demonstrating that DHR’s *693 reasonable efforts to rehabilitate the father had failed and that the father was unable or unwilling to discharge his responsibilities to and for the child.[5] § 26-18-7(a)(6), Ala.Code 1975. See also § 26-18 — 7(b)(1), (2), and (4), Ala.Code 1975.[6]
The juvenile court relied on the fact that the father might be able to rehabilitate himself in the future after receiving continued services from DHR. However, evidence introduced by DHR indicated that the father was becoming less committed to obtaining custody of the child as the proceeding progressed.[7] “ ‘This court has consistently held that the existence of evidence of current conditions or conduct relating to a parent’s inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.’ ” P.H. v. Madison County Dep’t of Human Res., 937 So.2d 525, 531 (Ala.Civ.App.2006). See also T.B. v. Cullman County Dep’t of Human Res., 6 So.3d 1195, 1202 (Ala.Civ.App.2008)(“In the absence of exceptional circumstances, a parent’s efforts at rehabilitation should not extend beyond 12 months from the date the child enters foster care because our legislature has established that period as the presumptively reasonable time for conducting reunification efforts. M.A.J. v. S.F., 994 So.2d 280, 291 (Ala.Civ.App.2008).”).[8]
The juvenile court has effectively set aside the child’s right to permanency and stability in favor of awarding the father and the paternal grandmother further opportunities to rehabilitate themselves. The child should not be forced to suffer a lack of permanency due to the father’s and paternal grandmother’s inability to provide, in a timely manner, a drug-free, safe, and stable home. We have held that, “at some point, [a child’s] need for permanency must outweigh repeated efforts by DHR to rehabilitate” a parent. N.A. v. J.H., 571 So.2d 1130, 1134 (Ala.Civ.App.1990) (citing § 26-18-7(b)(4), Ala.Code 1975). Further, “[i]n R.L.B. v. Morgan County Department of Human Resources, 805 So.2d 721, 725 (Ala.Civ.App.2001), this court held that maintaining a child in foster care indefinitely is not a viable alternative to termination of parental rights.” T.G. v. Houston County Dep’t of Human Res., [Ms. 2070841, April 24, 2009] — So.3d -, - (Ala.Civ.App.2009). Therefore, we conclude that maintaining the child in foster care while the father and the paternal grandmother attempt to rehabilitate themselves was error.
The judgment of the juvenile court is reversed, and this cause is remanded to the juvenile court with instructions to enter a judgment consistent with this opinion.
*694 REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and THOMAS, J., concur.
PITTMAN, J., dissents, with writing, which MOORE, J., joins.

. The father withdrew his petition for custody on August 18, 2008. The mother signed a waiver voluntarily relinquishing her parental rights to the child on September 8, 2008. The mother is not a party to this appeal.

. It was the father's testimony that he had contracted the flu in February 2008 and had not visited the child for fear of making her sick.

. By Act No. 2008-277, Ala. Act 2008, the provisions of the former Alabama Juvenile Justice Act, § 12-15-1 et seq., Ala.Code 1975, and the former Alabama Child Protection Act, § 26-18-1 et seq., Ala.Code 1975, were either repealed or amended, renumbered, and incorporated into the current Alabama Juvenile Justice Act ("AJJA”), § 12-15-101 et seq., Ala. Code 1975. The effective date of the AJJA is January 1, 2009; it is not applicable to this case.

. See § 12 — 15—71 (a)(3)c., Ala.Code 1975 (providing that, after a child is found to be dependent, the juvenile court may transfer legal custody to a relative who, "after study by the Department of Human Resources, is found by the court to be qualified to receive and care for the child " (emphasis added)). See supra note 3.

. Arguably, the father’s withdrawal of his petition for custody of the child on August 18, 2008, was a tacit admission that he was unable to discharge his responsibilities to and for the child.

. See supra note 3.

. Although the father visited the child in 2006 and sporadically in 2007, the father went approximately 4 months without visiting the child in early 2008, and at the time of the last hearing in October 2008, the father had not visited the child in approximately 11 weeks.

.The father had approximately 23 months to rehabilitate himself, from the time the father's paternity was adjudicated in January 2007 until the entry of the juvenile court’s final order. DHR provided services to the father throughout those 23 months, and, in addition, DHR offered visitation to the father from September 2006, before he had been adjudicated the father, through December 2006, a period of approximately four months.