THOMPSON, Presiding Judge.
The Jefferson County Department of Human Resources (“DHR”) appeals a judgment denying its petitions seeking to terminate the parental rights of L.S. (“the mother”) to C.M. and K.S. (hereinafter sometimes referred to as “the children”).
We note that although the separate actions related to the children were not formally consolidated in the juvenile court, the parties and the juvenile court treated the actions as if they had been consolidated. In April 2008, P.W. (“the maternal grandmother”) moved to intervene, and the juvenile court granted that motion. The maternal grandmother did not assert a claim seeking custody of the children; rather, she testified at the termination hearing that she wanted to be a relative placement for the children.
On July 30, 2008, DHR filed separate petitions seeking to terminate the mother’s parental rights to two of her children, C.M. and K.S.[1] The hearing on DHR’s petitions was continued several times and was ultimately conducted on February 17, 2010. On March 15, 2010, the juvenile court entered a single judgment relating to both actions in which it denied DHR’s petitions seeking to terminate parental rights. DHR filed a postjudgment motion, which the juvenile court denied. DHR timely appealed.
The record indicates that C.M. was born in March 2002 and that in 2005, the mother lost custody of C.M. and his two older siblings, K.C. and C.S.; it appears that at some point thereafter custody of C.M. and the older siblings was awarded to the children’s maternal aunt and the maternal grandmother.[2] The mother explained that she had lost custody because she had tested positive for the use of cocaine and marijuana and because she could not provide housing for C.M., K.C., and C.S.
K.S. was born in April 2006, and she was apparently immediately placed in the custody of the maternal aunt and the maternal grandmother. The mother has never had custody of K.S.
On December 16, 2006, DHR filed petitions seeking to have C.M. and K.S. and their older siblings removed from the custody of the maternal grandmother and the maternal aunt and declared dependent. In those petitions, DHR alleged that K.S. had been severely burned and that her custodians’ explanations of the cause of the injury were inconsistent. We note that although all four children were initially placed in foster care together, C.S. was eventually placed in the custody of a relative and K.C. was placed in the custody of her godmother. C.S. and K.C. are not subjects of this appeal. C.M. and K.S. *310 (hereinafter together referred to as “the children”) have remained in foster care since December 2006.
In 2005, when DHR first became involved with the family, the DHR social worker originally assigned the case formulated an Individualized Service Plan (“ISP”). Pursuant to that ISP, the social worker arranged for the mother to obtain substance-abuse treatment and a psychological examination. The record contains no evidence pertaining to the results of the psychological examination. Other goals of the ISP were that the mother submit to random drug-screen testing, attend Alcoholics Anonymous or Narcotics Anonymous meetings, attend parenting classes, and maintain employment and a stable residence.
The mother testified that she had completed an inpatient substance-abuse treatment program in 2006. At the termination hearing, the mother testified that she had not used drugs since she had completed substance-abuse treatment in 2006. She later testified that, at the time of the February 17, 2010, termination hearing, she had been “clean” for two months. The mother clarified that she had not used cocaine since September 2009 and that she had last used marijuana a few months before the termination hearing.
The mother admitted that she had not submitted to the random drug screens required by DHR under a “color coding” system. The mother testified that she had no particular reason for failing to take those drug-screen tests.
Prior to the termination hearing, the mother had submitted to drug-screen tests that appear to relate primarily to the dates of the periodic-review hearings in this matter. DHR submitted into evidence the results for the 10 drug-screen tests to which the mother had submitted since 2005.[3] Seven of the 10 drug-screen tests were positive for the use of cocaine, marijuana, or both.[4] Most recently, the mother had tested positive for cocaine and marijuana at a September 2009 review hearing. The mother also tested positive for the use of marijuana at the time of the February 2010 termination hearing.
Linda Ward, the DHR social worker assigned to the case between January 2007 and January 2008, testified that the mother made no progress toward reunification during the time she had been assigned to the case. Ward stated that she had never known the mother’s whereabouts and that the only way to contact the mother had been to leave messages with the maternal grandmother.
The mother testified that she had not been employed in 2006 or 2007. The mother worked full time as a cook in 2008, and she stated that she had earned approximately $190 per week. The mother testified that she had worked approximately two to three months for a temporary-services company in 2009.
At the time of the termination hearing, the mother was unemployed but was attending a job-training program. The mother stated that she received $150 from that program each time she completed a job-training class; she stated that “it might take a month, two months” to complete each of those classes.
*311 The mother testified that she had maintained the same three-bedroom home since 2007. According to the mother, her monthly expenses were approximately $1,100. The mother explained that the maternal grandmother helped her pay her monthly expenses. The mother testified that she could not say that the maternal grandmother had committed to support her financially, but she stated that the maternal grandmother “helps” her financially.
In November 2007, the juvenile court entered an order requiring the mother to pay $100 per month in child support. The mother testified that, at the time of the February 2010 termination hearing, she had paid a total of approximately $200 in child support.
The mother testified that she visited the children every third Friday. The mother stated that she does not have transportation, so the maternal grandmother would drive her to a McDonald’s restaurant to meet the foster mother and the children for visitation. We note that, during the pendency of this matter, the maternal grandmother was awarded unsupervised visitation with the children but that that visitation was later ordered to be supervised.
The mother testified that her visitation with the children was not required to be supervised. As noted earlier, the mother stated that she had no transportation and that she relied on the maternal grandmother to take her to visit the children; according to the mother, the supervision of visitation occurred because the maternal grandmother was present.
Charm Doughtery, the DHR social worker assigned to the case from January 2008 until the termination hearing, testified that, since she has worked on the case, all the mother’s and the maternal grandmother’s visitations with the children have been supervised. Doughtery explained that the mother’s visitation has been supervised because of the mother’s lack of honesty and her failure to comply with court orders. Doughtery testified that she was concerned that the mother and the children did not have a strong bond because of the infrequency of the mother’s visitations with the children.
At the time of the termination hearing, the mother had enrolled in a program providing parenting classes. The mother testified that she had recently attended one of the five required parenting classes in that program. The mother testified that the delay in her starting parenting classes was attributable to Ward and Doughtery’s failure to enroll her in those classes, and she stated that Doughtery had lost one set of her enrollment papers for those classes, thereby delaying her entry into those classes..
Doughtery and Ward testified that the only relative identified by the mother as a possible relative resource and who was willing to care for the children was the maternal grandmother. Neither social worker considered the maternal grandmother to be a viable relative placement for the children. Doughtery testified regarding the April 2006 burn incident that resulted in the children and their siblings’ being taken into protective custody. According to Doughtery, the maternal aunt and the maternal grandmother were present at the time K.S. was burned. Dought-ery testified that K.S. received severe burns to her forehead, the back of her head, her chest, and her leg.[5] No evidence *312 pertaining to the origin of the burns was presented at the termination hearing.
At the termination hearing, the maternal grandmother testified that she was at work on the evening that K.S. was burned and that the maternal aunt was the one present in the home when the injury occurred. The maternal grandmother testified that she purchased over-the-counter medications for the injury the next day and that that evening she took K.S. to the hospital for treatment when the burns did not appear to be healing. Doughtery testified that, after the hospital had notified DHR of K.S.’s injury, DHR initiated a child-abuse and neglect (“CA/N”) investigation. That CA/N investigation resulted in a finding of “indicated” for neglect and inadequate supervision of K.S. by the maternal grandmother.
Also, Ward testified that in addition to moving to intervene in the action, the maternal grandmother had initially had unsupervised visitation with the children. However, Ward testified that, in May 2007, the children’s foster mother contacted her to inform her that when K.S. had returned from visitation with the maternal grandmother she had a black eye and bruises on her forehead and lip. Ward stated that the maternal grandmother claimed to have been unaware that the child had been injured. DHR conducted a CA/N investigation that yielded a finding of “indicated” for inadequate supervision of K.S. by the maternal grandmother. After May 2007, the maternal grandmother’s visitation was suspended for a period. The record indicates that the maternal grandmother’s visitation was reinstated at some point after Ward was no longer the social worker assigned to the case. In June 2009, DHR moved to suspend the maternal grandmother’s visitation with the children; in its motion, DHR alleged that the maternal grandmother had recently been arrested on charges of possession of a controlled substance and that there had been two recent incidents of violence in her home. On July 13, 2009, the juvenile court ordered that the maternal grandmother receive only supervised visitation with the children.
Doughtery stated that, in addition to the two “indicated” CA/N reports relating to the grandmother in which K.S. was the child at issue, she had other concerns about the appropriateness of the maternal grandmother as a relative resource. Doughtery testified that there were additional CA/N reports involving someone with the maternal grandmother’s Social Security number, but she stated that the maternal grandmother had claimed not to know the other parties involved in those incidents. Doughtery also testified that, in 2005 or 2006, the maternal grandmother had tested positive for illegal drugs and had temporarily lost custody of her minor daughter, J.W., the mother’s sister. Also, Doughtery stated that she had heard a report that J.W. had stabbed her older brother during an altercation at the maternal grandmother’s home and that, during another incident, the maternal grandmother had suffered a broken arm after a confrontation with her son. DHR’s CA/N investigation into those incidents resulted in a “not indicated” finding regarding two aspects of that investigation and an “unable to complete” finding regarding another aspect.
The maternal grandmother acknowledged that there had been problems in her home between J.W. and her son, but she testified that her son no longer lived in the home or visited because, at the time of the termination hearing, he was in prison. In addition, the .maternal grandmother was *313 arrested in October 2009 for possession of a controlled substance. The maternal grandmother testified that she had her sister’s prescription medication when she was arrested on that charge, and she stated that the charge had been dismissed.
Doughtery testified that she had not attempted to contact C.M.’s alleged father; she stated that other social workers had been unsuccessful in their attempts to locate him. No evidence was presented indicating that any person involved in this case knew the identity of the father of K.S.
In response to questioning by the mother, Doughtery stated that she had not investigated the maternal aunt as a possible relative resource and that another aunt, E.C., had stated that she was not interested in serving as a placement for the children. Doughtery testified that the children are adoptable and that she believed it was in the children’s best interests to terminate the mother’s parental rights.
Our juvenile courts use a two-pronged test to determine whether to terminate parental rights:
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights:
(1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights.”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004) (citing Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990)).
DHR filed its petitions seeking to terminate parental rights on July 30, 2008, before the January 1, 2009, effective date of the Alabama Juvenile Justice Act, § 12-15-101 et seq., Ala.Code 1975. Therefore, this case is governed by the former Child Protection Act (“the former CPA”), § 26-18-1 et seq., Ala.Code 1975 (repealed). The former CPA specified:
“(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
“(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
“(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
“(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
“(4) Conviction of and imprisonment for a felony.
*314 “(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
“(6) That reasonable efforts by the Department of Human Resources ... leading toward the rehabilitation of the parents have failed.
“(7) That the parent has been convicted by a court of competent jurisdiction of [certain enumerated crimes.]
[[Image here]]
“(8) That parental rights to a sibling of the child have been involuntarily terminated.
“(b) Where a child is not in the physical custody of its parent ..., the court, in addition to the foregoing, shall also consider, but is not limited to the following:
“(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
“(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department ... and agreed to by the parent.
“(3) Failure by the parents to maintain consistent contact or communication with the child.
“(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
Former § 26-18-7. The former CPA specified that evidence warranting the termination of parental rights must be “clear and convincing.” This court has noted that “clear and convincing evidence” is
“ ‘[evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.’ ”
L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting § 6-11-20(b)(4), Ala.Code 1975). We note that, in cases involving the termination of parental rights, the paramount consideration for the courts is the best interests of the children involved. A.R.E. v. E.S.W., 702 So.2d 138, 139-40 (Ala.Civ.App.1997).
In its March 15, 2010, judgment, the juvenile court found the children to be dependent. The juvenile court made no factual findings or legal conclusions in support of its denial of DHR’s petitions seeking to terminate parental rights. On appeal, DHR argues that the juvenile court erred to reversal in denying its petitions to terminate the parental rights of the mother.[6] DHR contends the record contains clear and convincing evidence demonstrating that the mother has failed to adjust her circumstances to meet the needs of her children, that she is either “unable or unwilling to discharge [her] responsibilities *315 to and for the child[ren],” and that her situation is unlikely to change in the foreseeable future. Former § 26-18-7(a) and (b). As explained below, we agree.
DHR has been involved with this family since at least 2005. C.M. has been out of the mother’s custody since June 2005, and K.S. has not, since her birth in April 2006, lived with the mother. Both children were placed in foster care in December 2006, and they had remained there for more than three years at the time of the termination hearing.
The mother completed substance-abuse treatment in 2006. However, the record clearly demonstrates that the mother has continued to use illegal drugs. The mother tested positive for the use of cocaine or marijuana, or both, on 7 of the 10 drug-screen tests to which she submitted before the termination hearing. The mother tested positive for the use of marijuana on the day of the termination hearing.
At the time of the termination hearing, the mother testified that she had her own residence. However, the mother was relying on the maternal grandmother to pay the mother’s monthly expenses. The mother has not maintained stable employment and has not demonstrated that she could support the children. The mother stated that she received approximately $150 every month or two from a job-training program when she finished a class in that program. The mother has contributed only $200 in support for the children during the three years they have remained in foster care. The mother, just before the termination hearing, had begun the parenting classes that were first recommended in 2005 and that were listed as goals in several ISPs. Also, at the time of the termination hearing, the mother still had only supervised monthly visitation with the children. After reviewing the record on appeal, we must conclude that “[t]he juvenile court erred in implicitly determining that DHR had not produced clear and convincing evidence demonstrating that DHR’s reasonable efforts to rehabilitate the [mother] had failed and that the [mother] was unable or unwilling to discharge his responsibilities to and for the childfren].” Montgomery County Dep’t of Human Res. v. W.J., 34 So.3d 686, 692-93 (Ala.Civ.App.2009) (citing former § 26-18-7(a)(6), Ala.Code 1975, and former § 26-18-7(b)(1), (2), and (4), Ala.Code 1975).
The juvenile court found the children to be dependent; in fact, the juvenile court found the children to be dependent during each of the multiple review hearings conducted during the more than three years the children have been in foster care. The mother has not challenged that finding on appeal.
The juvenile court was also required to consider whether there existed a viable alternative to the termination of the mother’s parental rights. Ex parte Beasley, supra; B.M. v. State, supra. This court has held that leaving a child in foster care when the parent, as here, is not progressing toward reunification is not a viable alternative to the termination of parental rights. T.G. v. Houston County Dep’t of Human Res., 39 So.3d 1146, 1152-53 (Ala.Civ.App.2009); R.L.B. v. Morgan County Dep’t of Human Res., 805 So.2d 721, 725 (Ala.Civ.App.2001). This court has rejected “maintain[ing] the children in foster care until, perhaps, the mother could rehabilitate herself sufficiently to become a fit mother” when the court concluded that the possibility of such rehabilitation was “remote.” S.B. v. State Dep’t of Human Res., 743 So.2d 470, 472 (Ala.Civ.App.1999). In this case, the mother’s failure in the more than three years the children have remained in foster care to make significant progress toward reunification with the children indicates that the possi *316 bility of reunification in the future is similarly “remote.” Accordingly, we cannot conclude that the juvenile court could have properly concluded that there was a likelihood of reunification in the foreseeable future.
The maternal grandmother offered to serve as a relative resource for the children as an alternative to the termination of parental rights. However, DHR had rejected the maternal grandmother as a suitable relative placement. Doughtery explained that two CA/N reports resulted in “indicated” findings for neglect and/or inadequate supervision of the children against the maternal grandmother. Both of those “indicated” CA/N reports involved an injury to K.S., one of the children at issue in this matter. The maternal grandmother testified at the termination hearing that she was not present when K.S. was burned; she did not testify regarding the incident in which K.S. returned with bruises from visitation with the maternal grandmother. The maternal grandmother lost custody of her daughter, J.W., for some time in 2005 because of the maternal grandmother’s illegal drug use. We conclude that, “[bjased upon its study, DHR reasonably excluded the maternal grandmother as a potential placement for the children.” Montgomery County Dep’t of Human Res. v. C.R., 4 So.3d 1162, 1170 (Ala.Civ.App.2008) (holding that the juvenile court erred in denying a petition to terminate parental rights when “DHR proved that the maternal grandmother was unsuited to obtain custody of the children”).
In Montgomery County Department of Human Resources v. W.J., supra, the Montgomery County DHR obtained custody of a child in 2006, and the father’s paternity was established in January 2007. In December 2008, the juvenile court in that case denied a petition seeking to terminate the father’s parental rights, stating that, although the father had “fallen short” in his efforts toward reunification, he could continue those efforts. The juvenile court also refused to grant the paternal grandmother’s custody petition because she had failed a drug-screen test and had not complied with requests for continued testing. 34 So.3d at 688. This court reversed, holding, among other things, that in denying the paternal grandmother’s petition for custody of the child the juvenile court had impliedly concluded that placing the child with her was not a viable alternative to the termination of the father’s parental rights. This court then explained:
“The juvenile court has effectively set aside the child’s right to permanency and stability in favor of awarding the father and the paternal grandmother further opportunities to rehabilitate themselves. The child should not be forced to suffer a lack of permanency due to the father’s and paternal grandmother’s inability to provide, in a timely manner, a drug-free, safe, and stable home. We have held that, ‘at some point, [a child’s] need for permanency must outweigh repeated efforts by DHR to rehabilitate’ a parent. N.A. v. J.H., 571 So.2d 1130, 1134 (Ala.Civ.App.1990) (citing § 26-18-7(b)(4), Ala.Code 1975). Further, ‘[i]n R.L.B. v. Morgan County Department of Human Resources, 805 So.2d 721, 725 (Ala.Civ.App.2001), this court held that maintaining a child in foster care indefinitely is not a viable alternative to termination of parental rights.’ T.G. v. Houston County Dep’t of Human Res., [39] So.3d [1146, 1152] (Ala.Civ.App.2009). Therefore, we conclude that maintaining the child in foster care while the father and the paternal grandmother attempt to rehabilitate themselves was error.”
34 So.3d at 693.
Similarly, in this case, in denying DHR’s petition to terminate parental rights, the *317 juvenile court did not place the children with the maternal grandmother, thus implying that she is not a suitable placement for the children. Montgomery County Dep’t of Human Res., supra. Rather, the juvenile court left the children in their foster-care placement subject to future review. C.M. has been out of the mother’s custody since 2005, K.S. has never lived with the mother, and both children had been in foster care for more than three years at the time of the termination hearing. The children have a need for permanency. See Talladega County Dep’t of Human Res. v. M.E.P., 975 So.2d 370, 375 (Ala.Civ.App.2007) (“The children deserve to have a stable custody arrangement before 2008, having spent, at present, approximately two and one-half years in foster care.”). This court is aware of the presumption of correctness in favor of the juvenile court’s judgment. A.R.E. v. E.S.W., supra. However, after reviewing the evidence contained in the record on appeal, we must conclude that the juvenile court erred in denying DHR’s petitions to terminate the mother’s parental rights. State Dep’t of Human Res. v. A.K. 851 So.2d 1, 9 (Ala.Civ.App.2002). Therefore, we reverse the juvenile court’s judgment and remand the cause for the entry of a judgment in compliance with this opinion.
REVERSED AND REMANDED.
PITTMAN, BRYAN, and THOMAS, JJ., concur.
MOORE, J., concurs in the result, without writing.

. The petitions also alleged that the children had no legal fathers, and DHR sought to terminate the parental rights of any father of the children. No man claiming to be the father of either child defended this action.

. The order awarding custody of C.M. and his two older siblings to the maternal aunt and the maternal grandmother is not contained in the record on appeal. The record indicates that those children were removed from the mother’s custody pursuant to a dependency petition in 2005; K.S. was bom in April 2006, and she was apparently placed in the custody of the maternal grandmother and the maternal aunt. In dependency petitions filed in December 2006, DHR referred to the maternal aunt and maternal grandmother as the "custodians” of the children and their siblings.

. A DHR social worker testified that, under the color-coding drug-screen testing program, the mother, had she been compliant with that program, would have submitted to more than 10 drug-screen tests in the more than 3 years the children were in foster care.

. The dates of those positive drug-screen tests were July 1, 2005; January 23, 2006; May 30, 2006; November 8, 2006; February 22, 2008; March 19, 2009; and September 11, 2009.

. After that testimony, the mother's attorney objected for the first time to Doughtery's testifying regarding an incident that occurred before she was assigned to the case. The juvenile court sustained the objection, but there is no indication that the mother sought to strike *312 the testimony already provided or that the juvenile court did so.

. DHR asserts no argument regarding the juvenile court's judgment as it pertains to the denial of that part of its petitions seeking to terminate the parental rights of the children’s unknown father or fathers.