MOORE, Judge.
T.H. (“the father”) and C.H. (“the mother”) appeal from a judgment of the Jefferson Juvenile Court finding their child, G.H. (“the child”), to be dependent. We reverse and remand with instructions for the juvenile court to dismiss the action.

I. Procedural History

On January 3, 2008, the Jefferson County Department of Human Resources (“DHR”) filed a petition alleging that the child was dependent because the child reportedly had been sexually abused by the father. That same date, DHR also filed a petition alleging the dependency of M.H., the child’s younger sister. In that petition, DHR alleged that, due to the allegations that the father had sexually abused the child and the refusal of the father to agree to refrain from contact with M.H., M.H. was “at risk of sexual abuse.”
Because the child and M.H. had already been removed from the home of the parents, the Jefferson County Family Court (“the juvenile court”), acting in its capacity as a juvenile court, conducted a shelter-care hearing on January 3, 2008. See Ala. Code 1975, former § ^-lS-OOla).[1] Following that hearing, the juvenile court *1240 awarded DHR custody of both children, awarded the mother supervised visitation with the children, prohibited any contact between the children and the father, ordered M.H. to be interviewed by a local child-advocacy group, and continued the shelter-care hearing to January 11, 2008.
The record indicates that, in her interview, M.H. did not disclose any inappropriate sexual behavior committed against her by the father. At the January 11, 2008, shelter-care hearing, the juvenile court returned custody of M.H. to the mother, awarded the father supervised visitation with M.H., and ordered the mother not to allow the father to live or stay overnight in the home with M.H. The juvenile court maintained its prior custody and visitation orders in regard to the child. On February 11, 2008, following a status conference, the juvenile court returned unrestricted custody of M.H. to both parents and modified its earlier visitation order to allow the father supervised visitation with the child, who remained in the custody of DHR.
A year and a half later, over the course of several days in August 2009, the juvenile court held a hearing on both dependency petitions, neither of which had ever been formally amended. On November 3, 2009, the juvenile court entered a single judgment in which it dismissed the dependency petition in regard to M.H. but granted the dependency petition as to the child, without setting forth any specific findings of fact. Pursuant to that judgment, DHR maintained custody of the child subject to the supervised-visitation rights of the parents, who were each ordered to submit to a psychological examination and counseling and other treatment as recommended by the examining psychologist. On November 17, 2009, the parents filed a postjudgment motion seeking to have the judgment as to the child set aside; the juvenile court denied that motion on December 1, 2009. The parents filed their notice of appeal on December 14, 2009. This court conducted oral argument regarding the issues raised in the brief of the parents on June 29, 2010.

II. Issues

On appeal, the parents argue that the juvenile court impliedly found that the father did not commit sexual abuse against the child as alleged in the dependency petition filed by DHR. The parents contend that, because the juvenile court found that DHR had not proven the allegations in its dependency petition concerning the child, the juvenile court had an imperative statutory duty to dismiss the dependency action and return custody of the child to them. Alternatively, the parents argue that, because the record does not contain sufficient evidence to support a finding of dependency, the petition should have been dismissed.

III. The Sexual-Abuse Allegations

As noted above, the juvenile court did not make any specific findings of fact regarding the basis for finding the child dependent. The parents argue, however, that, because the juvenile court dismissed the dependency petition as to M.H., the juvenile court obviously concluded that the father had not sexually abused the child. The parents point out that DHR alleged, and attempted to prove at trial, only one *1241 ground for the dependency of M.H., namely, that the father had committed sexual abuse of the child and that such conduct placed M.H. at risk for sexual abuse. Hence, according to the parents, the finding that M.H. was not dependent must equate to a rejection of the allegations of sexual abuse. We agree.
“ ‘[I]n the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.’” B.L.T. v. V.T., 12 So.3d 123, 127 (Ala.Civ.App.2008) (quoting Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996)). The only finding that would support a judgment dismissing the dependency petition as to M.H. would be a finding that M.H. was not at risk of sexual abuse by her father.
Moreover, we note that, if the juvenile court had indeed found that the father was a danger to M.H. due to the alleged prior acts of sexual abuse against the child, the juvenile court certainly would not have placed M.H. back into the unrestricted custody of her parents, especially only one month after her removal from the parents’ home and long before a full trial had even been conducted. We must presume the juvenile court knows and follows the law. See J.F.S. v. Mobile County Dep’t of Human Res., 38 So.3d 75, 78 (Ala.Civ.App.2009). A child is certainly dependent and in need of the care and supervision of the State if his or her father has committed sexual abuse against a sibling, which the mother has failed to prevent, even if the father did not commit such sexual abuse against the child in question. See Ala.Code 1975, former § 12-15-1 (10)j. (defining a “dependent child” as one who is in need of care and supervision because he or she “is physically, mentally, or emotionally abused by the child’s parents, guardian, or other custodian or who is without proper parental care and control necessary for the child’s well-being because of the faults or habits of the child’s parents, guardian, or other custodian or their neglect or refusal, when able to do so, to provide them”); P.H. v. Madison County Dep’t of Human Res., 937 So.2d 525 (Ala.Civ.App.2006) (in termination-of-parental-rights case, clear and convincing evidence proved child was dependent because, among other things, father had assaulted and sexually abused child’s half brothers); and M.G. v. State Dep’t of Human Res., 44 So.3d 1100 (Ala.Civ.App. 2010) (juvenile court properly found dependency of children in termination-of-parental-rights case based on mother’s repeated failure to protect children from sexual abuse by maternal uncle). A child who is dependent because he or she is subjected to a serious risk of sexual abuse by a parent should never be returned to the unrestricted custody of the abusive parent and the parent who neglectfully allowed such abuse to occur. See Odom v. State Dep’t of Human Res., 562 So.2d 522, 523-24 (Ala.Civ.App.1990) (affirming the trial court’s judgment denying the mother’s petition for the return of the custody of her children when the evidence demonstrated, among other things, that the mother intended to continue a relationship with her husband, who had been convicted of sexually abusing her children). The juvenile court would have violated the law by returning M.H. to the custody of the parents if it was convinced of the allegations contained in the dependency petitions filed by DHR.
To determine that the juvenile court found that the sexual abuse alleged by *1242 DHR had occurred, we would have to conclude that the juvenile court intentionally returned an eight-year-old daughter to the home of a father who had sexually abused the daughter’s nine-year-old sister.[2] We refuse to indulge any construction of the judgment indicating that the juvenile court committed such a grievous legal and immoral error. See generally Avery Freight Lines, Inc. v. Persons, 250 Ala. 40, 46, 32 So.2d 886, 890 (1947) (“[Tjhat construction will be adopted which will support the decree rather than destroy it.”). Rather, we are convinced that the only reasonable construction of the judgment is that the alleged sexual abuse did not occur.
A finding that the father did not commit sexual abuse against the child would not be clearly erroneous. The record shows that the child, who was born 15 weeks prematurely on July 14, 1998, after the mother’s amniotic sac ruptured and who survived birth only after a series of surgeries and other medical procedures during a 4-month stay in a neonatal-care unit, was diagnosed with autism, mental retardation, sensory integration disorder, pervasive developmental delays, and disruptive behavior disorder.[3] Various medical evidence indicates that those conditions rendered' the child delusional and echolalic and contributed to the development of aggression, hyperactivity, defiance, and significant impulsivity.
As noted in the records of Dr. Julie Dennis, the child’s pediatrician, at some point the child began “play[ing] with herself a lot down there” and even inserting objects into her vagina. During a psychiatric hospitalization in February 2006, a staff member laid down with the child in the child’s bed in an attempt to comfort the child, provoking a violent reaction. According to the mother, after that hospital stay — during which the child had repeatedly asked her psychiatrist, “Are you my Daddy?” — the child began to make crude sexual remarks. The child later began touching others inappropriately and inserting objects into her vagina. The mother testified that the child may have been exposed to a victim of sexual abuse during her hospitalization and that she believed that the child was repeating phrases and behavior learned from that victim. When the child repeatedly implicated “Daddy” as a sexual abuser during a later psychiatric hospitalization at another facility in May 2006, a representative of that facility originally reported the re *1243 marks to DHR as implicating the father in sexual abuse, but the representative later reported that the child was referring to staff members of the facility, not the father, as “Daddy,” behavior the child may have learned from her prior hospitalization. The parents also testified that the child referred to other men as “Daddy.” Dr. Edgar Finn, a child and adolescent psychiatrist who treated the child from October 2004 to July 2007, advised the parents to redirect the child when she acted out sexually.
Due to the child’s unusual sexual behavior and her continued reference to “Daddy” as a sexual abuser, DHR conducted several investigations to determine if the father was sexually abusing the child; all the investigations ended in a finding of “not indicated.”[4] On July 23, 2007, the parents placed the child in a group home for persons with special needs operated by Ability Plus. The parents informed the supervisors of the group home about the child’s sexual behavior, and they advised the staff to follow Dr. Finn’s advice to redirect the child when she exhibited sexually inappropriate behavior. Over the next five months, while residing at the group home and going to school at Johnson Elementary, the child continued to engage in bizarre sexual acting out as witnessed and documented by Rhonda Williamson, Amanda Bowden, Donna Duncan, and Melissa Nix, employees of the school.
On December 23, 2007, the child began her Christmas visitation with her parents at their Birmingham home. During her stay, the family mainly stayed at home together or shopped. The parents both testified that the child was never alone with the father during that time. The child’s visit ended on December 28, 2007, at which time the father returned the child to the group home around 10:00 in the morning. Thirty minutes later, Ability Plus staff performed a “routine body check” on the child during which they observed that the child’s genital area “appeared irritated.” According to a staff supervisor, the child indicated that “Daddy” put his “peepee” in her mouth, as well as stating something about a dust buster and “Mama getting up blood.” They immediately took the child to Athens-Limestone Hospital for further examination. Records from the hospital visit indicate that the child said that she had been given an enema, which was a course of treatment used to treat constipation the child suffered as a side effect of her medications. A nurse examined the child and found redness in the vaginal area and slight redness in the anal area, but she found no tears or swelling. DHR did not call any medical practitioner to testify at trial, nor did it present any deposition testimony from a medical practitioner to interpret the results of the examination. Latasha Hardy, the DHR caseworker assigned to the case, testified that the hospital records did not support the allegations that DHR had stated in its dependency petition regarding the physical findings of sexual abuse.
DHR picked up M.H. on December 31, 2007, and took her to Children’s Hospital for a possible sexual-abuse examination. However, as the attending physician dictated,
“because there was no credible indicators of an acute sexual assault (no disclo *1244 sure, no behavior change, no physical symptoms) and there were no indicators of an emergency medical condition (no physical complaints or symptoms), an emergent genital examination was not indicated.”
The hospital advised DHR to conduct a forensic interview to verify its suspicions. DHR thereafter referred M.H. to forensic examiners at the Prescott House; in her interview, M.H. did not disclose any sexual abuse. At trial, the father denied that any sexual abuse had occurred. The mother testified that she had “watched [the father] like a hawk” following the original sexual-abuse allegations but that she had become convinced that the father had not done anything wrong.
DHR also retained Rebecca Dossett, Ph. D., to interview the child. Dr. Dossett stated in her January 10, 2008, report as follows:
“This examiner cannot conclude if [the child] was or was not sexually molested by her father. There are many reasons to call the accusation into question. First, [the child] has a history of extensive masturbation, which could account for the injury to her vaginal area. From the comments about things that she had put into her ‘peepee,’ it is very likely that she masturbates using objects. Second, due to her Autistic Disorder, she is very echolalie. She very easily could have heard someone speaking about ‘peepee in mouth’ and echoed that phrase. Third, the fact that [the child] had to be verbally prompted to bring up the topic at all creates a question. Fourth, [the child] resists close physical interaction, and it is likely that she would have physically resisted any attempt at close, tight physical contact. In that case, she would probably have had bruises or marks on other parts of her body, where the accused would have had to hold her down. Fifth, the use of language is one of the core deficits in people with a diagnosis of autistic disorder. [The child] does not use language in a typical way. Therefore, it is impossible to determine what she means when she uses language. It cannot be assumed that the meaning of words is the same to her as they are to non-autistic people.
“In summary, the evidence that has been presented as evidence of sexual abuse to [the child] can all be called into question, secondary to her having autistic disorder. Thus examiner cannot rule it out, but definitely cannot confirm the allegation based on evidence presented.”
However, on March 12, 2008, after meeting with the child’s elementary-school principal and Nix, the school’s nurse, Dossett changed her opinion to indicate that, due to the detailed and specific content of the statements the child had made to school employees, and their firm belief that the child was reporting actual events, Dossett now believed that the child was reporting actual sexual abuse. Although DHR relied primarily on Dossett’s March 12, 2008, report in issuing an “indicated” finding, DHR did not call Dossett as a witness at the trial to further explain her change in position. Also, DHR did not call any other expert witness to bolster its case of sexual abuse.
Dr. Finn did appear at trial as an expert witness for the parents. Dr. Finn testified that, due to her various conditions, the child did not understand the import of her comments but would perceive the attention she would get from making those comments. According to Dr. Finn, as part of her disruptive behavior disorder, the child *1245 “was highly motivated by attention.” Dr. Finn maintained that the child’s sexual remarks were “a manifestation of her im-pulsivity and attention seeking behaviors and things like that.” He stated that the child’s accounts of sexual acts could be “fantasy,” or repetition of something another child had said, or something the child had viewed or dreamed. Dr. Finn also considered the child delusional as an aspect of her autism.
The foregoing evidence indicates that the child suffers from autism and other mental disorders that have manifested themselves by, among other things, aggressive sexual “acting out” and that, according to Dr. Finn and, at least at one point, Dr. Dossett, rendered statements of the child regarding the alleged sexual misconduct of the father unreliable, apparently a conclusion DHR shared before December 28, 2007. As noted above, M.H., who obviously was considered a reliable reporter, had denied any sexual misconduct by the father. The record contains no definitive physical evidence indicating that the father had sexually abused the child. Lastly, the juvenile court had an opportunity to assess the demeanor of the father and the mother at trial; during their testimony, the parents totally denied that any sexual abuse had ever occurred. For all the foregoing reasons, the juvenile court had before it sufficient evidence to sustain a finding that the father did not commit sexual abuse of the child and that M.H. was not at risk of sexual abuse by remaining in the custody of the parents.

TV. The Effect of the Sexual-Abuse Findings

The parents argue that, because Ala.Code 1975, former § 12 — 15—52(c)(1), required a petitioner to set forth with specificity “the facts constituting the dependency” and Ala.Code 1975, former § 12 — 15—65(f), required proof of those allegations by clear and convincing evidence, when DHR does not provide clear and convincing evidence of the allegations asserted in a dependency petition, a juvenile court must dismiss the dependency petition. See Ala.Code 1975, former § 12-15-65.
Although the language of the operative statutes appears to support their argument, the parents overlook established caselaw that a juvenile court may find dependency based on any ground proven at trial, even a ground not contained in any dependency petition. See M.M.S. v. D.W., 735 So.2d 1280, 1232 (Ala.Civ.App.1999) (“However, contrary to the mother’s argument, the juvenile court can find a child dependent based upon grounds not asserted in the dependency petition. Martin v. State Dep’t of Human Resources, 502 So.2d 769, 770 (Ala.Civ.App.1987) (stating that this court did not need to ‘find that the Department [of Human Resources] proved the specific grounds alleged in the petitions because we [found] that the juvenile court had other sufficient grounds for determining that the children are dependent.’).”). We also note that, under Rule 17, Ala. R. Juv. P., a juvenile court may allow an amendment of an original dependency petition “at any time,” which presumably would include after the entry of the judgment, so as to conform the judgment to the evidence, as authorized by Rule 15(b), Ala. R. Civ. P. Thus, a juvenile court’s judgment finding dependency may be affirmed if the evidence at trial supports any ground for dependency, even one not specifically alleged in the dependency petition. Accordingly, we reject the parents’ argument that a failure by DHR to prove that the father committed sexual *1246 abuse should automatically result in a reversal of the judgment finding the child dependent. Rather, we conclude that a finding that the child is dependent could validly rest on any other ground for dependency proven at trial.

V. Other Grounds for Dependency

Again, the juvenile court did not set forth in its judgment any specific findings of fact or conclusions of law explaining the basis for its dependency determination. In such cases, this court may affirm the judgment if the evidence supports any ground for dependency. See generally M.B. v. R.P., 3 So.3d 237 (Ala.Civ.App. 2008). The grounds for dependency that could apply in this case were contained in Ala.Code 1975, former § 12-15-1(10), which defined a “dependent child” as a child:
“a. Who, for any reason is destitute, homeless, or dependent on the public for support; or
“b. Who is without a parent or guardian able to provide for the child’s support, training, or education; or
“c. Whose custody is the subject of controversy; or
“d. Whose home, by reason of neglect, cruelty, or depravity on the part of the parent, parents, guardian, or other person in whose care the child may be, is an unfit and improper place for the child; or
“e. Whose parent, parents, guardian, or other custodian neglects or refuses, when able to do so or when such service is offered without charge, to provide or allow medical, surgical, or other care necessary for the child’s health or well-being; or
“f. Who is in a condition or surroundings or is under improper or insufficient guardianship or control as to endanger the morals, health, or general welfare of the child; or
“g. Who has no proper parental care or guardianship; or
“h. Whose parent, parents, guardian, or custodian fails, refuses, or neglects to send the child to school in accordance with the terms of the compulsory school attendance laws of this state; or
“i. Who has been abandoned by the child’s parents, guardian, or other custodian; or
“j. Who is physically, mentally, or emotionally abused by the child’s parents, guardian, or other custodian or who is without proper parental care and control necessary for the child’s well-being because of the faults or habits of the child’s parents, guardian, or other custodian or their neglect or refusal, when able to do so, to provide them; or
“k. Whose parents, guardian, or other custodian are unable to discharge their responsibilities to and for the child; or
“l. Who has been placed for care or adoption in violation of the law; or
“m. Who for any other cause is in need of the care and protection of the state; and
“n. In any of the foregoing, is in need of care or supervision.”
However, a finding of dependency must be based on clear and convincing evidence. Ala.Code 1975, former § 12-15-65®. Clear and convincing evidence is
“[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm *1247 conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.”
Ala.Code 1975, § 6-ll-20(b)(4). In dependency cases, in which the burden of proof requires clear and convincing evidence, it is not enough that the evidence “raise[s] a question” as to the dependency of the child, as the dissent maintains. 70 So.3d at 1268 (Thomas, J., dissenting).
“ ‘[T]he evidence is not sufficient to allow appellate affirmance of a judgment based on [a] finding [that is required to be established by “clear and convincing” evidence, such as a finding of dependency,] unless the record contains evidence from which the fact-finder reasonably could have determined that the fact was proven by clear and convincing evidence.’ ”
Ex parte Mclnish, 47 So.3d 767, 774 (Ala.2008) (quoting with approval KGS Steel, Inc. v. McInish, 47 So.3d 749, 759 (Ala.Civ.App.2006) (Murdock, J., concurring in the result)). Thus, when this court faces the question whether sufficient evidence sustains a dependency determination, this court
“must also look through a prism to determine whether there was substantial evidence before the [juvenile] court to support a factual finding, based upon the [juvenile] court’s weighing of the evidence, that would ‘produce in the mind [of the [juvenile] court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion.’ ”
Ex parte McInish, 47 So.3d at 778 (quoting Ala.Code 1975, § 25-5-81(c)). With the appropriate standard of review in mind, we consider the various arguments made by DHR, and the various reasons asserted in the dissent, in support of affirming the judgment.[5]

a. The Alleged Failure of the Parents to Avail Themselves of DHR Services

In its brief, DHR contends that the parents “repeatedly inhibited [DHR]’s ability to provide services aimed at fostering the safe reunification of the family.” Once a child is removed from the family home, DHR generally has a duty to use reasonable efforts to reunite the family as quickly and as safely as possible. See Ala.Code 1975, former § 12-15-65(g)(3) & (m); and J.B. v. Jefferson County Dep’t of Human Res., 869 So.2d 475, 481 (Ala.Civ. App.2003) (plurality opinion). That duty often requires DHR to provide services fostering the safe reunification of the family. See H.H. v. Baldwin County Dep’t of Human Res., 989 So.2d 1094 (Ala.Civ.App. 2007) (plurality opinion). Presumably, DHR contends that, when parents inhibit its ability to provide reunification services, a juvenile court may find a child dependent *1248 and withhold the custody of the child from the parents. We need not address the merits of that contention, which, we note, is not supported by citation to any statute or caselaw, because we conclude that DHR did not present sufficient evidence to support its theory.
DHR commonly uses individualized-service-plan (ISP) meetings to determine the services needed to rehabilitate the parents and to reunite the family. At those meetings, the DHR caseworker assigned to the case, along with the parents, the parents’ attorneys, the guardian ad litem, the service providers, and other interested parties invited by DHR, routinely identify the reason DHR has become involved with the family, the goals to end DHR’s involvement, and the means and timetable to achieve those goals.
In this case, DHR assigned the case to Iris Johnson, a social worker in its child-abuse-and-neglect (“CA/N”) unit, in late December 2007. Johnson testified that, as a CA/N social worker, she ordinarily schedules only one ISP meeting after a child is removed from the custody of his or her parents, and then other units of DHR schedule follow-up ISP meetings to take place every six months. Johnson testified that, in this case, after performing her preliminary investigation of the sexual-abuse allegations, she attempted to schedule an ISP meeting. Johnson originally scheduled the ISP meeting for January 11, 2008, but, because the father’s attorney could not attend, that meeting was canceled. On January 22, 2008, Johnson rescheduled the ISP meeting for the next day, but the parents informed her, pursuant to the advice of their attorneys, that they needed seven days’ notice for an ISP meeting,[6] and Johnson therefore rescheduled the ISP meeting to January 30, 2008. On January 28, the mother telephoned Johnson to confirm the ISP meeting, but, the next day, the father telephoned and told Johnson the mother had the flu and that they would not be able to attend the scheduled ISP meeting. Johnson nevertheless held an ISP meeting without the parents on January 30, which Johnson referred to as a “split” meeting.[7]
The report from the January 30, 2008, ISP meeting indicates that, in order for DHR to no longer be involved with the family, any threat of sexual abuse needed to be removed and the children needed to be provided a safe environment where a reasonable person would feel the child is safe from sexual abuse and physical harm. In order to achieve that goal, the ISP team agreed that DHR would provide funds for the child to visit a counselor to determine if “any real abuse” had occurred and that the child would remain at the Ability Plus group home, where the parents would be allowed supervised visits with the child. The ISP team did not set any requirements for the parents to achieve or identify any services that the parents needed to receive in order to meet any goals in the initial ISP report.
*1249 Johnson testified that, on some occasion after February 11, 2008, she scheduled a meeting with the parents to observe M.H. Johnson stated that she also wanted to “try and sit down and do a little bit of the ISP and have them sign it.” According to Johnson, when she arrived, the mother said that Johnson had not telephoned and made an appointment for that meeting. At that point, the mother became irate and began screaming that DHR could not take M.H., as a DHR social worker, accompanied by two uniformed police officers, had done earlier on the night of December 31, 2007. Johnson testified that the father came down the stairs and, after trying unsuccessfully to contact his attorney, was able to reach the attorney for the mother, who advised the parents not to let Johnson question M.H. Johnson stated that she did not complete the ISP report at that time but that she did finish it later.
DHR did not put into evidence any ISP reports issued between January 30, 2008, and May 5, 2009. Apparently, DHR conducted regular ISP meetings beginning in April 2008 and occurring every six months thereafter, all of which one or both parents attended. The May 5, 2009, ISP report states that “DHR is currently involved with your family due. to receiving a report on 12-28-07 alleging that [the child] had been sexually abused while at home with her parents during the Christmas Holidays.” That report goes on to say that, in order for DHR to end its involvement with the family, “[the parents] must provide their children with a safe, stable, and nurturing environment that is free from allegations of sexual abuse that will take their children into adulthood.” The ISP report required Ability Plus, as of May 5, 2009, to inform the parents of all the child’s psychiatric and medical appointments and all individual-educational-plan (“IEP”) meetings regarding the child in order to assure the parents’ full participation in the child’s care and education.[8] The ISP report also required the parents to provide an audio recording of their voices reading a book for the child to listen to when going to bed. The ISP report further clarified the visitation plan and schedule for the parents. However, the ISP report did not require the parents to receive any particular service in order to meet the overarching goal of providing the child with a safe environment free of the threat of sexual abuse.
Latasha Hardy, the DHR social worker assigned to the case, testified that DHR ordinarily requires a parent who has been separated from a child for safety reasons to submit to a psychological evaluation as a prerequisite to determining the services needed to rehabilitate the parent. However, DHR never requested a psychological evaluation of the parents. As a result, according to Hardy, DHR never addressed *1250 any services for the parents. Although Hardy testified generally that the parents never availed themselves of DHR’s services, Hardy testified specifically that the only time she could recall the parents refusing a service was when the mother had stated she did not want to change visitation supervisors.[9]
In this case, any finding that the parents had “repeatedly inhibited [DHR]’s ability to provide services aimed at fostering the safe reunification of the family,” as DHR argues, would not be supported by clear and convincing evidence. The record shows indisputably that DHR was capable of conducting an ISP meeting with or without the parents; that Johnson experienced trouble scheduling the initial ISP meeting with the parents due to attorney involvement and the mother’s illness, but she was able to complete her ISP meeting with the parents before she reassigned the case; that one or both parents attended every ISP meeting after Johnson left the case; that DHR never outlined any plan requiring the parents to receive any services designed to safely reunite the family; that DHR did not take even the most preliminary step to offer rehabilitation or reunification services to the parents; and that the parents did nothing to inhibit DHR from performing its statutory duty. Hence, we cannot assume the juvenile court rested its finding of dependency on the ground that the parents had not availed themselves of DHR’s sendees, even if that could be considered a legal ground for a finding of dependency, which we do not decide.

b. The Alleged Inability of the Parents to Meet the Special Needs of the Child

At oral argument, DHR contended that the parents had not demonstrated an ability to meet the special needs of the child.[10] The dissent also maintains that the parents “lack[ ] the ability to ... adequately address the child’s many special needs.” 70 So.3d at 1269 (Thomas, J., dissenting). The parents do not dispute that the child has special needs as a result of her autism and her other mental and behavioral disorders. At trial, Hardy testified that the mother has a very “hands- *1251 on” relationship with the child and is “very affectionate with her, very attentive to her needs. She’s a mother. She’s very loving with [the child].” Johnson testified that the parents are “well aware of their child’s autism.” Both Johnson and Hardy admitted that the parents had been very proactive in requesting appropriate services for the child, which Hardy stated was “a good thing.”
The following evidence shows that, if anything, Hardy and Johnson understated the efforts of the parents in meeting the special needs of the child. The evidence reveals that the parents have exceeded any standard of good parenting in their efforts to secure the appropriate medicinal, therapeutic, and educational means to combat the challenging diseases afflicting the child.
The record shows that the parents first identified the child’s pervasive developmental delays at about a year to two years of age. At that point, the child would not eat solid foods or wear shoes, could not communicate except through grunting and gesturing, and, when frustrated, would bang her head against her crib. The parents took the child to Dr. Holly Mussell, who diagnosed the child with sensory integration deficit. To address that diagnosis, and the various associated problems exhibited by the child, the parents arranged for the child to receive, on a regular basis, speech, occupational, and physical therapy, as well as occasional recreational therapy.
Despite the therapeutic intervention, the child continued to experience developmental delays. On May 1, 2002, the parents took the child to the Department of Pediatrics at the University of Alabama-Birmingham School of Medicine for evaluation by Dr. S. Lane Rutledge. At that point, the parents informed Dr. Rutledge that, in addition to her other problems, the child would have “meltdowns” during which the child would become very upset and very aggressive, would tear up things, and would hurt others and herself. Dr. Rutledge felt the child had “many autistic features” that required evaluation by “the Autism Clinic” and noted that “[t]he family has done an incredible job with this young lady.”
On May 7, 2002, the mother telephoned Dr. Rutledge’s office to receive a recommendation as to the appropriate specialist to evaluate the child for autism. Apparently based on that telephone conversation, Dr. Rutledge arranged for the child to be evaluated at the Sparks Autism Clinic, a part of the University of Alabama-Birmingham Civitan International Research Center, on September 18 and October 9, 2002. The evaluation on both dates was very difficult because of the child’s high level of distress, but the examiners concluded that the child did meet the criteria for autistic disorder as well as for sensory integration disorder and developmental delays. The team recommended that the parents continue with the therapies and special-education services the child was already receiving and that they employ management techniques and medication prescribed by a psychiatrist to address the child’s temper tantrums, impulse control, and other behavioral problems.
In June 2003, the parents took the child to Over the Mountain Pediatrics for evaluation by a pediatrician, Dr. Julie Dennis. Dr. Dennis referred the parents to Children’s Hospital to address the child’s autism and special needs. The occupational therapist who evaluated the child noted that the child enjoyed a “[s]upportive, committed family.” Based on the evaluation conducted at Children’s Hospital in *1252 July 2003, the child began receiving occupational therapy through Children’s Hospital to address several identified problems: delayed cognition and ability to attend to task, delayed self-care skills, delayed feeding skills and decreased toleration for food textures, and delayed sensory processing. The child also began receiving speech therapy through Birmingham Speech and Hearing. In a patient-intake form, the mother characterized the relationship between the family and the child as one of intense love, but also one in which frustration, resentment, and exhaustion sometimes interfered. For those problems, the family, starting in October 2003, began seeing Dr. Jodi Brooks, a psychologist, and Carolina Endert, a social worker, for counseling and support.
The child entered Grantswood Elementary, a public school within the Jefferson County district, at the start of the school year in 2003. The child was placed in a special-education setting with a one-on-one aide and seemed to perform well during the 2003-2004 school year. In therapy sessions, the mother related that the school had reported that the child was disruptive and defiant; however, the school generally was responsive to the child’s needs and the mother’s expectations, which the mother conveyed in a meeting with school representatives. To supplement her special education, the child had continued receiving speech and occupational therapy, until her goals were met. In late March 2004, the mother obtained additional in-home services through the Family and Community Services program at Glenwood, Inc., a Birmingham mental-health treatment center, to help the family implement structure for, and provide respite care to, the child. Endert also advised the mother on parenting and disciplinary techniques for the benefit of the child. In addition, the parents addressed the child’s health issues, consisting mainly of respiratory illnesses, earaches, and constipation, through Dr. Dennis.
On April 16, 2004, the child visited Dr. Moran, an adolescent and child psychiatrist. Dr. Moran recommended that the child continue taking the medication melatonin to assist her sleep and try taking the medication Metadate CD to improve her focus, and Dr. Moran discussed the risks and benefits of the medications Prozac and Risperdal to address the child’s other problems of compulsiveness and persever-ation. Although the father felt the child had inherited his sensitivity to medications, the parents implemented the medication regimen suggested by Dr. Moran. The mother related on May 7, 2004, that the school had reported that the child seemed to be doing better since she had begun taking Prozac.
The child underwent adenoid and' tube placement surgery on May 20, 2004. Before the surgery, the mother took the child to Dr. Dennis to assure that the child’s lungs were clear enough to withstand the procedure.
In June 2004, the parents started attending a support/education group together, as well as attending individual sessions, at the mental-health treatment center operated by Glenwood, focusing on using consistency when disciplining the child and having appropriate expectations of the child. After a beach vacation, the family returned to Birmingham and the child underwent dental-rehabilitation surgery. The child appeared to be doing well and to be bonding with M.H. during this period.
As the new school year approached, the mother arranged for Glenwood to send a representative to Grantswood Elementary *1253 to make recommendations for the child. The mother testified that she learned at some point that Grantswood Elementary had lost funding over the summer for a one-on-one aide to attend to the child during the school day. The mother informed Endert that she was discussing with her church the possibility of starting a faith-based school for higher functioning autistic children and their siblings.
In August or September 2004, while under the supervision of Grantswood Elementary employees, the child ran away from the school playground, which was not fenced. The school employees eventually found the child some 30 or 40 minutes later, crying and screaming in a briar patch in nearby woods. The mother testified that, following that incident, the child developed post-traumatic stress disorder, which caused her “meltdowns” to escalate to the point the child was out of control if she was not restrained. Endert’s notes indicate that, after that incident, the child displayed increasingly aggressive behavior, began eating like an animal, began scratching at M.H., and generally regressed in her behavior. The mother testified that the child had a meltdown in which, among other things, she placed her head through a bedroom window, the first time the child had done anything that severe. The mother testified that at that point she became concerned for the safety of the child and M.H. On September 20, 2004, the parents admitted the child to Children’s Hospital for acute psychiatric care, at which point Dr. Finn first became involved with the child. The mother also arranged for a Glenwood representative to visit the school to identify the source of the child’s agitation. The parents further placed a peg board over the child’s bedroom window for protective purposes.
The child remained in Children’s Hospital until September 29, 2004. During her stay, the child was placed on an individualized behavior-modification program, and the parents participated in family therapy focused on medication management, monitoring medication side effects, garnering resources, parenting strategies, and modifying the school environment to incorporate the skills they learned. Initially, the child was not receptive to the treatment; however, after a change in her diet and the placement of items from her home to mimic her routine, the child began to interact more appropriately. After discussing the matter with the parents, the psychiatrists at Children’s Hospital prescribed the child Risperdal and Benadryl, and they did not observe any side effects from the medication. Upon concluding that the child showed a brighter mood and a calmer effect, and upon receiving reports that the child seemed less impulsive and more compliant once she had access to her favorite toys and routine, the mental-health professionals at the hospital held a discharge conference with the parents. During that conference, the parents discussed all the findings, recommendations, and safety plans regarding the child, to which they verbalized understanding and concurrence. The doctors diagnosed the child with autistic disorder and recommended that the child continue to see a psychiatrist for medication management, that the family continue to participate with in-home therapy staff, that the family therapy focus on behavior management, that the child restart occupational therapy, that the school provide a one-on-one behavioral aide on a daily basis, and that the play area at the school be fenced.
After the discharge of the child, the parents became very proactive in assuring that Grantswood Elementary could meet the child’s educational and other needs as set out in the discharge plan. The mother *1254 complained to Dr. Brooks that the school did not seem to be educating the child as much as babysitting her and that the child was not receiving enough one-on-one attention. On October 1, 2004, Endert recommended that the mother involve a special-education service in the next IEP meeting. The mother indicated that the parents were meeting with advocacy groups, apparently the Alabama Disabilities Advocacy Program and the Special Education Action Committee, to assist with the problems they were encountering with the school. The father also met with an occupational therapist to formulate a plan to implement the therapist’s recommendations at the school, and he received information from relatives while he was in California regarding how that state handled children with special educational needs. Endert indicated that the parents were amassing an “impressive” amount of information regarding the educational rights of the child. The mother indicated that the parents met with school officials to discuss the problems, but a Jefferson County Board of Education official stated that the child did not need a one-on-one aide and that no fence would be erected. The school system also indicated that it wanted to delay reentry of the child into school. In response, the father prepared a report showing that, based on the opinions of her mental-health professionals, the child needed the one-on-one behavioral aide. After receiving no positive response, the parents filed a grievance with the school system. The father then contacted medical professionals in the United Kingdom and contacted the Sparks Clinic for further testing in an effort to help the child.
The parents did not resolve their grievance during the 2004-2005 school year. The child went to summer school and started back at Grantswood Elementary at the beginning of the 2005-2006 school year. While attending school in late August 2005, the child gained access to a pair of scissors. When a teacher attempted to quickly recover the scissors, the teacher accidentally cut herself badly. Although the principal of the school did not blame the child for the incident, the child blamed herself, and, as a result, she again regressed in her behavior as she had following the briar-patch incident. Following the scissor incident, the child was again evaluated by the Sparks Clinic and was found to have autistic disorder and mixed developmental delays; she was also found to be at risk for a diagnosis of mental retardation due, in part, to cognitive deficits indicating that the child behaved at an age equivalent of 3 years, 5 months. The clinic professionals believed the child had a number of strengths, including “a loving and caring family,” that would help in modifying her behavior. The clinic set out a litany of educational recommendations for the child and indicated that those recommendations, among which was the use of a one-on-one behavioral aide, should be included in the child’s next IEP and implemented by the child’s school.
In October 2005, representatives of Grantswood Elementary reported that M.H. had indicated that the father had acted sexually inappropriately with her. DHR investigated the incident and found no evidence of sexual abuse. Following that report, which the parents perceived as retaliation for their grievance, the parents removed both children from the public-school system and the mother began home schooling the children through a licensed *1255 faith-based program.[11] The father thereafter attended a three-day seminar on autism treatments.
The children’s home schooling initially went well. The mother noticed that the child was interacting well with church members, and the parents became more active in advocacy issues for disabled children. On November 30, 2005, after a third visit to the Sparks Clinic, the child was diagnosed with pervasive developmental disorder and mild mental retardation, as well as behavioral issues including aggression, hyperactivity, defiance, and significant impulsivity. The clinic again provided the parents with behavioral-modification and other techniques to use to help the child, including a recommendation that interaction with M.H. be encouraged. The parents were advised to implement those recommendations in addition to continuing to see Dr. Finn for medication management. Based on the new diagnoses, the child qualified for financial assistance through the Alabama Department of Mental Health, which the parents accessed.
In January 2006, the child began exhibiting more bizarre and unpredictable dangerous behavior without any overt precipitating event. After the child indicated that she wanted to hurt somebody, the mother admitted the child back into Children’s Hospital for observation. The child remained in the hospital from January 16, 2006, to February 10, 2006. The treating doctors initially stopped all medications and placed the child in a therapeutic milieu with one-on-one supervision. They then replaced the child’s medications, at that time Risperdal and Celexa, with Seroquel, Zoloft, and Depakote, and instituted a structured behavioral-modification program. The hospital discharged the child, who they indicated was in a stable condition, to the parents with a plan to follow up with Dr. Finn.
According to the parents, following her discharge, the child did not seem to be benefiting from her new medications, so Dr. Finn changed the medication regimen. On February 20, 2006, the child underwent tube-placement surgery for her ears. The next day, the child experienced another “meltdown” requiring the mother to restrain her. Based on all the above concerns, the parents and Dr. Finn had the child admitted to Hillcrest Hospital on February 21, 2006. The intake records from Hillcrest Hospital that were completed by the mother indicate that the parents wanted to be involved with the child’s treatment and that, although the child’s condition had been very stressful on the family, the parents were very loving and supportive to the child and hoped the child would be stabilized. The next day, the mother informed Endert that the parents were considering placing the child outside the home and that the mother was contacting the Alabama Department of Mental Health to obtain a Medicaid waiver for assistance.
The child did not do well in Hillcrest Hospital. As stated above, on February 22, 2006, a staff member laid down with the child in the child’s bed, provoking'a violent reaction. The child continued to require constant supervision due to hyperactivity, impulsivity, sexual acting out, and *1256 assaultive behavior. Changes to her medication and participation in therapeutic exercises did not seem to have much positive effect. The child also had very poor reality testing. The child, however, eventually improved and was discharged on March 21, 2006, into the care of the parents "with instructions that the child be kept on the medications ReVia, Vistaril, and Risperdal as monitored by Dr. Finn.
In late March 2006, the mother informed Endert that, after her discharge from Hill-crest Hospital, the child’s care and educational needs escalated. The mother contacted DHR and arranged to meet with its “Multiple Needs Committee” to obtain financial assistance in order to get help for the child. In April 2006, the mother also informed DHR that, based on the child’s comments, she believed that the child had experienced some sexually inappropriate conduct while she was hospitalized. The mother consulted with Dr. Dennis, Dr. Finn, and a children’s health insurance program clinic regarding her concerns.
On May 1, 2006, the mother informed Endert that she had enrolled M.H. in a faith-based school and that the child would soon be evaluated by mental-health specialists employed by Glenwood. Dr. Finn admitted the child to the mental-health treatment center operated by Glenwood on May 2, 2006, with a diagnosis of autistic disorder, disruptive behavior disorder, and moderate to severe mental retardation. The initial treatment team’s meeting notes from May 8, 2006, indicate that “[the mother] is a strong advocate for services for [the child].” Subsequent notes also indicate that the child enjoyed “tremendous family support.” Glenwood discharged the child from the treatment center on June 21, 2006.
The child appeared to benefit from Glen-wood’s intervention, and, as a result, the mother wanted to enroll her in the school operated by Glenwood. The mother felt the child would benefit from the rigid structure and consistency the child had received at the treatment center. However, because Glenwood did not have any vacancies at its school and the director of the school doubted that the school would benefit the child, the parents were not able to enroll the child in the education program at Glenwood. After that plan failed, the parents arranged for the child to be evaluated by the Alabama Department of Mental Health to determine her eligibility for residential services.
In the meantime, the parents enrolled the child in a public summer-school program for evaluation. The parents met with public-school officials and developed an IEP for the child, which the mother signed. The father, however, objected to the IEP on the ground that the child was entitled to free, appropriate, safe, inclusive, and the least restrictive placement with educators and other professionals trained to teach and provide special services to autistic children. Endert advised the parents that it appeared that the public-school system could not meet the child’s special needs and that she hoped the mother would spotlight the educational plight facing autistic children. As a result, the parents again decided to home school the child rather than place her in the public-school system.
Between October 2006 and January 2007, the mother home schooled the child. The child also received speech and occupational therapy through Children’s Hospital and recreational therapy through Mitchell Place. In November 2006, the Department of Mental Health began providing in-home respite services for the child.
In January 2007, the mother reported to Dr. Finn that the child had bit her tutor *1257 and had also hit M.H. while M.H. was sleeping. Dr. Finn noted that, according to the mother, the child needed “almost hand-over-hand supervision” to limit her impulse-control difficulties. By March 2007, the parents agreed that the child was not benefiting from the mother’s home schooling. The mother felt that the child would benefit from placement in a group home; however, the father believed that the child should not be placed in a group home at that time. The father testified that the child responded better to his authority. Thus, at that point, the mother started working nights outside the home and the father took over primary care of the child. In May 2007, the father enrolled the child in the HANDS program, an educational program specializing in autistic children operated by graduate students. After the child’s in-home respite service provider resigned, and the father’s working hours extended, the mother was forced to quit working outside the home.
In March 2007, the parents, upon the recommendation of the Department of Mental Health, met with representatives of Ability Plus. The mother testified that the parents agreed to try placement of the child in the group home operated by Ability Plus for the rehabilitation, education, and development of the child. The parents envisioned that they would be allowed free access to the child and that, “if it doesn’t work, we’ll bring her home.” The parents met with Dr. Finn on July 19, 2007, and stated to him that they believed the child had a good prognosis because of the structure and consistency she would receive at the group home. The placement would end Dr. Finn’s psychiatric care of the child, which would be turned over to Dr. Manjula Swamy. At trial, Dr. Finn summarized his interaction with the parents as follows:
“You know, like many parents they wanted advice. I gave them advice. And like smart parents they are, they didn’t take my advice all the time. They wanted to make their own choices and decisions and talk it over among themselves. But, in general, they were not non-compliant. They generally did what I recommended or tried at least sometimes with success and sometimes not so. But they worked — we had a good working alliance, I felt.”[12]
The child started living at the Ability Plus group home in Athens on July 23, 2007. Bobbi Mason, a supervisor at the group home, testified that, after the child first began residing in the group home, Mason and the mother had constantly talked on the telephone about the needs of the child and that she developed a “very close” relationship with the mother and a very good relationship with the father. The mother also constantly visited the child at the group home, with the father attending visits mainly on the weekends. Mason testified that the child loved the visits because “[the mother] likes to nurture [the child].” Regarding the visits, the mother testified as follows:
“Q [By Counsel for the parents]: When you all were in Ability Plus visiting with *1258 [the child], what would be going on around you all while you were visiting with [the child]?
“A: Well, in the beginning it was varied. And it was such a long drive. I must say there were times when we would come and everyone would play together. That would be [M.H.] and [the child] would interact and the other children as well.
“[M.H.] is a very caretaking little mothering little person. And she would take charge and she would set a tone for the children and make up games for them. It was a lot of interacting with the children. And mother would be there. There were also occasions where I would just fall asleep on the bed with [the child] or I would take a nap while the kids were playing. They would be in there with me, but we were all together.
“Times where [the child] would crawl in bed and I would tickle her and hold her. And often — I would not leave until we had reconnected on an emotional level. That was my objective. The kids needed to play, but we needed to bond.”[13]
Mason testified that she sometimes felt that the cuddling between the mother and the child was “just too much touching” considering the child’s diagnoses and behavior “but that [it] was a therapy thing that [the mother] liked to do.” The records show that the mother had been engaging in that therapeutic activity since the child was much younger, and the mother testified that the child needed cuddling.[14] Mason admitted that, although the child did not like to touch or hug others, she did like to hug the mother.
The sexual-abuse allegations made by Ability Plus staff members in late 2007 interrupted the visits between the child and the parents. The mother testified that, when she first saw the child again in late January 2008, she was alarmed to find the child was “emaciated skin and bones,” much thinner than she had been when visiting the parents approximately 30 days earlier. Records show the child weighed 57 pounds on December 28, 2007, when she was returned by the parents to the Ability Plus group home, but that her weight had dwindled to 52 pounds by January 9, 2008, when she was diagnosed with anorexia nervosa. The mother immediately began taking food supplements and Ensure protein drinks to the child to help the child restore her weight, and, together with the efforts of Ability Plus staff, the child eventually regained the weight.
As set out above, DHR conducted its first ISP meeting on January 30, 2008, in the absence of the parents. In the ISP report, the team, which consisted of DHR, Ability Plus representatives, and Department of Mental Health employees, listed as “family members strengths” that the family loved one another and that the family wants what is best for the children. As noted, the ISP report did not indicate any reason for DHR’s involvement with the *1259 family other than the allegations of sexual abuse. Accordingly, DHR did not identify any problem with the parents’ supervisory skills that needed attention. DHR had previously determined, following its prior sexual-abuse investigations in 2005 and 2006, that “both parents displayed appropriate protective capacities surrounding the children.”
Consistent with that general theme, the juvenile court returned M.H. to the unrestricted custody of the parents on February 11, 2008. The record shows that, at the time of trial, M.H. had been in the care of the parents for over a year and a half and that, except for her fear that DHR would again remove her from the family home, the child was doing exceedingly well. Apparently for that reason, at the close of the trial, the guardian ad litem basically recommended that the dependency petition as to M.H. be dismissed, which the juvenile court did.
In July 2008, the mother and M.H. moved to Huntsville to be closer to the child and to get out of the Jefferson County environment. The father continued to live in Birmingham and he would stay in Huntsville on weekends, until he finally moved there in the summer of 2009. On July 9, 2008, at a coordinated meeting with employees of DHR and Ability Plus, the parents presented a list of concerns regarding the care and education the child was receiving while at the Ability Plus group home, fully evidencing their commitment to meeting the child’s needs.[15]
At that point, Hardy, the DHR caseworker, instructed that the parents were *1260 to be invited to all IEP meetings, which apparently had not been the case before. As set out above, see swpm note 8, the parents were eventually invited to attend all medical and psychiatric appointments for the child on May 5, 2009, and the record indicates that thereafter they did so. In addition, the father continued to *1261 conduct research on alternative methods for treating the child’s autism up to the date of the trial.
In summary, the evidence appears undisputed that the parents understand that the child suffers from a variety of mental conditions impairing her ability to behave normally and that the parents have, as the mother put it, “exhausted every resource” in an effort to treat those mental conditions and modify the behavior of the child. The evidence also appears undisputed that the parents continued up to the time of the trial to be active participants in the education, care, and nurturing of the child despite their physical separation. At trial, DHR presented no testimony indicating that the means employed by the parents to meet the special needs of the child were inappropriate in any way. In fact, the evidence indicates that, while in the custody of DHR, the child receives treatment for her special needs almost identical to the treatment the child received while in the custody of the parents. Unquestionably, the parents remain committed to appropriately meeting the special needs of the child in the future. The juvenile court could not have been clearly convinced otherwise and could not have rested its dependency determination on the ground that the parents could not properly meet the special needs of the child.
c. The Alleged Inability of the Parents to Properly Supervise the Child
The evidence also appears undisputed that, due to her various mental conditions, the child requires supervision in order to assure that she does not harm herself.[16] The evidence reveals that the parents took various measures to assure that supervision, such as modifying the bedroom of the child, obtaining in-home services to augment their monitoring of the child, advocating for a behavioral aide to be with the child while at school, and placing the child in a group home.
In arguing in its brief that the parents simply lack the capability to meet the child’s special supervisory needs, DHR asserts that “Dr. Finn stressed the child needed supervision, which had not been provided by [the mother], the child’s primary caregiver during his tenure.” Actually, in the portion of his testimony specifically cited by DHR, Dr. Finn testified as follows:
“Q [By Counsel for the parents]: And were you ever able to during the time that you worked with [the child] to get those behaviors under control such that you could say she wasn’t a danger to the safety and welfare of other children or sometimes even adults?
“A: Well, I felt that with supervision that was being provided by her parents, she was reasonably safe. But without such supervision, I was concerned for her safety. And, also, concerned that if — in particular the mother who I worked with most of the time wasn’t able to provide that support and that limit setting and control over her behav *1262 ior, I didn’t know that she would be safe.”
Dr. Finn did not state that the mother was incapable of properly supervising the child so as to keep the child reasonably safe. Dr. Finn testified that, “with the supervision that was being provided by her parents, [the child] was reasonably safe.” However, Dr. Finn stated that if the parents, particularly the mother, was not able to provide that supervision, with appropriate limit setting and control, then he did not know that the child would be safe.[17]
DHR did not present any expert testimony indicating that the parents were incapable of providing appropriate limit setting and control so as to prevent the child from harming herself. The record indicates that the parents had been instructed in techniques designed to provide structure and consistency for the child so as to avoid triggers to the child’s episodic misbehavior, to minimize any attention to misconduct, to redirect the child to more beneficial conduct, and to reward proper behavior. The record contains no evidence indicating that the parents had failed to properly use those techniques. The record also shows that the parents implemented discipline techniques advocated by an Amish psychologist and that the parents had used physical restraint as a last measure to protect the child.
During the trial, Mason, in responding to a question regarding the child’s sexual acting out, testified as follows:
“... when [the child] walked by and kind of smacked my hand or hit my head or something, whatever she done. I stood up and, I said, ... we do not do that. I will not hit you. You will not hit me. And her dad answered and said she listened to you because you spoke in authority. With her mom, she will just laugh about it and continue to do it, but he said she does not do me that way. And she stopped. She said I won’t hit you. I said, no, you will not hit me.”
Even assuming that the juvenile court could have extrapolated from that simple statement that the mother could not act appropriately to prevent the child from harming herself,[18] an issue that we do not decide, that interpretation would not sup *1263 port a finding that the parents, plural, lack the ability to properly supervise the child. See Ala.Code 1975, former § 12-15-l(10)k. (defining a dependent child as a child “[w]hose parents ... are unable to discharge their responsibilities to and for the child (emphasis added)); see also J.B. v. DeKalb County Dep’t of Human Res., 12 So.3d 100 (Ala.Civ.App.2008) (plurality opinion) (recognizing that children are not dependent if one parent in a two-parent household is capable of properly caring for them). As stated by Mason, the father conveyed to Mason that the child responded to his authority more readily than that of the mother, an occurrence not uncommon among many nuclear families. The father further testified that, within 60 days of the trial, he would be able to assume full-time care of the child. The record contains no evidence indicating that the father is incapable of properly supervising the child so as to prevent her from harming herself.
Moreover, we note that the evidence shows that Ability Plus and the elementary school the child attends use techniques similar to those employed by the parents to control the behavior of the child. Those techniques have not always successfully prevented the child from harming herself, as Mason, Williamson, Duncan, Bowden, and Nix testified. The evidence does not indicate that anyone is more capable of supervising the child than the parents. DHR has utterly failed to show how depriving the parents of the custody of the child has materially lessened the incidences of self-injurious behavior or improved the supervision the child receives.
On the other hand, the mother testified that the child had regressed while in the care of Ability Plus. The mother stated that the child had stopped urinating or defecating on herself before her admission to the Ability Plus group home but that she had recently resumed that behavior. Mason agreed that the child appeared to be regressing in the period leading up to the trial, detailing the self-injurious behavior and other misbehavior committed by the child while in the group home and in the custody of DHR. That testimony tends to prove that the child actually received superior care and supervision in the home of the parents.
The record contains insufficient evidence to support a finding that the parents cannot adequately protect the child from harm. The record shows that the parents are at least as capable as DHR of properly supervising the child. Hence, the juvenile court could not have rested its finding of dependency on that ground.

d. The Parents’ Medical Choice

At oral argument, DHR contended that the juvenile court could have found the child dependent based on evidence indicating that the parents intended to try a new course of treatment for the child if the child was returned to their custody. The mother testified that, during the period leading up to the trial, while living at the Ability Plus group home, the child had exhibited very “drugged behavior” and was acting like “a space cadet” and “a zombie.” The father testified that if the child was returned to the custody of the parents, he would immediately take her to Dr. Finn to have her “detoxed,” as Dr. Finn had done years earlier, so that her medications could be reevaluated. The father testified that he would then take the child to one of several autism specialists who use a program designed by Dr. Rick Solomon, which the father had researched. The father testified that, in conjunction with the medical treatment, the parents *1264 would also implement in the home adaptive-behavior analysis and teaching techniques that he had studied.
In R.C. v. State Department of Human Resources, 587 So.2d 335 (Ala.Civ.App.1991), this court reversed a judgment finding a child dependent on the basis that the custodians of the child would not consent to a surgical operation designed to lengthen one of the child’s legs. 587 So.2d at 337-38. The court held that the State Department of Human Resources is authorized to intervene and obtain a judgment compelling the medical treatment under Ala.Code 1975, former § 12 — 15—1 (10)e., only when the custodians of a child are refusing a treatment deemed necessary for the child’s health or well-being. 587 So.2d at 338. It follows that, under R.C., a child would also be dependent if the form of medical treatment selected by a parent endangers the health or well-being of the child. Absent those two scenarios, however, the State may not intervene in the medical decisions made by parents.
At oral argument, DHR conceded that it had not presented any evidence indicating that the program described by the father would endanger the child in any way. The dissent mentions the program, 70 So.3d at 1267 (Thomas, J., dissenting), but it also fails to explain how a decision by the parents to try another recognized method of treatment for autism, following the failure of numerous other treatments, indicates the dependency of the child. In the absence of any evidence indicating that the child would be harmed by the new treatment, the juvenile court could not find the child dependent on the basis of the parents’ proposed treatment plan.

VI. Conclusion

In conclusion, this court holds that the juvenile court impliedly found that the father did not commit sexual abuse as alleged in the dependency petitions filed by DHR. This court determines that the juvenile court could nevertheless find the child dependent on any ground proven by sufficient evidence at trial. However, after thoroughly reviewing the evidence, this court finds that a reasonable fact-finder could not have been clearly convinced of the dependency of the child. We therefore reverse the juvenile court’s judgment, and we remand the case with instructions that the juvenile court dismiss the dependency petition relating to the child and restore custody of the child to the parents.
REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and BRYAN, J., concur in the result, without writings.
THOMAS, J., dissents, with writing, which PITTMAN, J., joins.

. By Act No. 2008-277, Ala. Acts 2008, the Alabama Legislature, among other things, amended and renumbered the statutes governing juvenile proceedings, previously codi *1240 fied at Ala.Code 1975, § 12-15-1 et seq., and enacted the Alabama Juvenile Justice Act ("AJJA”), codified at Ala.Code 1975, § 12 — 15— 101 et seq. The effective date of the AJJA is January 1, 2009. Because DHR’s petition was filed before the effective date of the AJJA, the AJJA does not apply to this case.

. We note that in the Community Notification Act, Ala.Code 1975, § 15-20-20 et seq., the legislature has declared that a parent classified as an adult criminal sex offender may not establish a residence or other living accommodation with his or her minor child if the parent is convicted of any criminal sexual offense in which any of the parent's minor children were the victim, if the parent has been convicted of any criminal sex offense in which a minor was the victim and the minor resided or lived with the parent at the time of the offense, or if the parent has been convicted of any criminal sexual offense involving a child, regardless of whether the parent was related to or shared a residence with the child victim. Ala.Code 1975, § 15-20-26(c)(2)-(4). Although those provisions do not apply to this case, because the father was not convicted of any sexual offense, we believe the legislative policy embodied in the Community Notification Act reinforces that juvenile courts cannot return a minor child to the custody of a parent who has been found to have sexually abused a sibling, of that child.

. Medical and psychiatric professionals definitively diagnosed the child with those conditions. The records also indicate that the child may also have attention deficit and hyperactivity disorder, schizophrenia, bipolar disorder, obsessive compulsive disorder, and post-traumatic stress disorder.

. A "not indicated” finding occurs “[w]hen credible evidence and professional judgment does not substantiate that an alleged perpetrator is responsible for child abuse or neglect.” Ala.Code 1975, § 26-14-8(a)(2).

. One reason asserted by the dissent is that the juvenile court "had before it the recommendation of the guardian ad litem, urging the juvenile court to find the child dependent." 70 So.3d at 1269 (Thomas, J., dissenting). The dissent fails to mention that the guardian ad litem, at oral argument before this court, maintained that the child was dependent because the guardian ad litem believed that evidence proved that the father had committed sexual abuse against the child. The recommendation of the guardian ad li-tem, therefore, cannot be cited to support a finding that the child is dependent on some other ground.

. Alabama Admin. Code, Rule 660-5-47-.04(7) (Alabama Dep’t of Human Res.), requires “[s]ufficient advance notice" of any ISP meeting.

. The dissent maintains, in part, that the child could be found dependent because "[t]he juvenile court ... heard evidence that the parents had refused to cooperate with DHR....” 70 So.3d at 1267 (Thomas, J., dissenting). To support that statement, the dissent cites the foregoing evidence indicating that DHR experienced difficulty in getting the parents to attend the first ISP meeting. Like DHR, the dissent cites no legal authority indicating that the failure of a parent to immediately submit to an ISP meeting renders a child dependent.

. The dissent maintains that “the parents were encouraged to attend the child’s psychiatric appointments; however, the parents only attended one appointment." 70 So.3d at 1267 (Thomas, J., dissenting). The record shows that one or both parents attended every psychiatric appointment for the child before she was placed into the Ability Plus group home. Thereafter, Ability Plus arranged for the child to see a new psychiatrist. On May 5, 2009, DHR conducted an ISP meeting attended by the father. The ISP report from that meeting indicates that, for the first time, the parents would be notified a week in advance of all the child’s medical and psychiatric appointments so that they could attend those appointments under DHR supervision. The record indicates that the child had only one other visit with her psychiatrist after that, on August 6, 2009, which the parents attended to discuss their concerns that the child was being over-medicated. The record does not support any contention that the parents ever missed a psychiatric appointment of which they had been notified and invited to attend.

. The dissent contends, in part, that a dependency finding can be affirmed on the basis of a visitation dispute between the mother and Ability Plus, which erupted in the mother’s use of harsh language in front of the child. 70 So.3d at 1265 (Thomas, J., dissenting). That dispute arose out of the group home’s decision to exclude relatives of the child from a visitation the child had with the mother in February or March 2009. The dissent does not cite any legal authority indicating that a child should be considered dependent because a parent becomes frustrated and irate following a physical custodian’s denial of visitation. Furthermore, our supreme court decided long ago that a child is not in immoral or dangerous surroundings while living in a home with a parent who uses coarse language. See Striplin v. Ware, 36 Ala. 87 (1860).

. Although DHR did not make any argument on the point at trial or on appeal, the dissent points out that the parents did not provide voluntary child support while the child was in DHR’s custody. 70 So.3d at 1267 (Thomas, J., dissenting). The record shows that the juvenile court repeatedly reserved the issue of child support and never ordered the parents to pay any child support. The parents nevertheless provided the child food and a minimal amount of clothing. In addition, the parents were responsible for assuring that the child received her federal supplemental security income payments and for obtaining the Medicaid waiver that funded the child’s stay at Ability Plus. The dissent cites no legal authority for the proposition that the nonpayment of additional, "voluntary” child support under these circumstances renders a child dependent. 70 So.3d at 1267 (Thomas, J., dissenting).

. The record indicates that the parents eventually filed petitions for assistance with the United States Department of Education Office of Civil Rights and the American Civil Liberties Union regarding the matter. However, the record does not indicate the actions taken by those entities to assist the parents.

. The dissent summarizes the foregoing testimony as follows: “Dr. Finn further testified that the parents would not always take his advice regarding how to care for the child, although he stated that, in general, the parents were not 'non-compliant.' " 70 So.3d at 1267 (Thomas, J., dissenting). That reading omits the crucial point that Dr. Finn felt the parents were being “smart” in evaluating his advice and reaching their own decisions on how best to treat the child. Dr. Finn certainly did not imply that the parents were ignoring his advice at the peril of the child as the dissent's summary suggests.

. The dissent misreads the foregoing excerpt to indicate that the mother sometimes napped during visits while M.H. took charge of the child. 70 So.3d at 1267 (Thomas, J., dissenting). The evidence shows without dispute that the child was always under the supervision of an adult during her visits with the mother at the Ability Plus group home.

. DHR offered no evidence to support Mason’s subjective belief, which was not expert testimony, that the cuddling between the mother and the child was an inappropriate therapy for the child.

. That document stated, in part:
"After eight years of working with professionals, and researching both independently and in structured forums, coupled with what I have observed this past year with [the child's] stay at Ability Plus, I have come to a considered conclusion.
"As [the child’s mother] who has an ultimate knowledge of who [the child] is and what she needs, I am convinced that while I need the services of Ability Plus for structure and for 24/7 help with [the child], (and I thank all of you for your diligence and support up front), [the child] needs the added ingredient of her Mother and family, who will nurture her with love and warmth, and will take a very personalized interest in her health, development and welfare. [Hardy], I think the records DHR has of my extensive work and involvement in procuring professional and educational intervention for [the child] bears witness to at least some of the knowledge, skills, and experience I possess.
"That being said, it is my intent to more proactively involve myself in a 'co-operative] relationship with Ability Plus and in [the child’s] care, which will involve at least an increase in my visits with [the child], and a direct involvement with [the child’s] School, IEP’s, Educational Programs, and in developing a relationship with her Doctors. In light of this, what courtesies and considerations would Ability Plus request of me?
“I have requested a list of [the child’s] Doctor’s names and contact numbers. I have Dr. Reynolds, (ophthalmologist) and Dr. Swam[y], but I would like her Pediatrician’s name and her dentist's name. I will schedule independent visits with each to make sure all are aware of [the child's] complete History, as I did with Dr. Reynolds when I had to educate him about [the child's] Retinopathy of Prematurity about which he had never heard. This was vital information to [the child’s] diagnosis and prognosis. It is critical that I be brought up to date on [the child’s] mental and physical status, and meeting one on one with each doctor should accomplish much of this.
"I also want to be certain that Ability Plus has all of [the child's] medical records, because I suspect that if you had understood and followed all of the records, this most recent situation involving DHR may never have happened. I thought we had communicated clearly in the presence of Ziva Hatcher of Mental health and Amy Hubbard your ex-social worker, about the origins, extensive investigations, professional conclusions, and recommended management by two prominent Birmingham Psy *1260 chiatrists and Autism specialists, of [the child's] sexual obsessions, but I was mistaken. I'd like to keep any misunderstandings to a minimum through more effective communication and my own physical involvement.
"I spoke with Dr. Dennis, [the child's] previous Pediatrician and told her that [the child's] weight was about 55-60 pounds, and that she was probably in excess of 4 feet tall now. Dr. Dennis of Mountain Brook, Alabama, has been caring for [the child] since she was a little over a year old, and she has been concerned about [the child's] history of being substantially under standard weight since her premature birth. We know that one good flu virus could emaciate [the child] and potentially result in hospitalization. [The child] had the RSV shots every month from April to October for the first two years of her life.
"Bobb[i] Mason told me that you have an RX for [the child’s] food supplements. The aids told me that there was none in the home because [the child] goes through them faster than Medicaid will pay.
“I would like to ask that [the child] be given one supplemental drink after each meal. This [e]nsures that she will eat her meals, but also that she will get the extra calories and nutrition needed to thrive.
"I will augment any product that Medicaid refuses to cover. We have brought what amounts to a case in my car, along with jumbo cans of Ravioli, for snacks, because I know this can be costly, which we’d like to drop off this afternoon when [the child] returns from school.
"I am requesting that I be kept informed by DHR while our trial is pending, and then by Ability Plus of anything that concerns [the child’s] care, welfare, and training. For all of the years of hard work and study I have invested in my precious daughter’s life, I am able to contribute in a positive way to her overall care, and would like to be considered a primary resource, and kept in the loop. My efforts are precisely why [the child] is in your facility now. I’ve been, for nine years, seeking assistance with, not exclusion from [the child’s] care.
"I learned recently that her Medicaid waiver, for which I spent years petitioning, had simply been allowed to terminate for want of minor paper work that seems to have fallen through some crack. I had the papers sent to my home, filled them out and signed them, and [the child's] waiver has been reinstated as of yesterday 7/07/08, per Amanda Roberts of the Florence County Dept, of Medicaid.
"I spoke with Mr. Reed at SSI on June 23, 2008, and he informed me that [the child’s] SSI [supplemental security income] payments had gone from a status of suspended, to terminated for lack of attention. I told him that I had communicated [the child’s] living status and was available to sign any documents necessary, but had never had any request. Amy Hubbard had told me that Ability Plus Administration would handle the paper work, and I just trusted this. Mr. Reed said that Ability Plus has a liaison in place and should be able fairly easily to request and fill out the necessary application, but an application would have to be resubmitted since it was allowed to expire. Yesterday, the Medicaid Supervisor asked for my permission to communicate with Mrs. Allen, and I encouraged her to, so Mrs. Allen should have been contacted and updated on all of this. I'd like to see Ability Plus rightfully compensated, and I’m a little surprised that no one has spoken up, but these are the types of challenges I hope to help alleviate by being more present.
“I have observed [the child] trembling, going rigid, and exhibiting aggression, all of which indicate to me that she may possibly have toxic levels of [Risperdal] in her system. We need to have her blood levels checked as soon as possible. She has also nodded off while sitting upright in chair, in front of me. This seems to indicate a possible excess of sedative. This coupled with [the child] giving herself a black eye, and being asked to leave her swimming class are indicators to me that she needs to have a re-evaluation of her medications and of their toxicity levels. Could we do this as soon as possible please?”

. The dissent also argues that the child is a danger to other children. 70 So.3d at 1265-67 (Thomas, X, dissenting). However, the dissent has not cited any legal authority that a child who is dangerous to other children is therefore dependent. The dependency statute allows a juvenile court to transfer custody of a child in order to prevent harm to the child, see L.B.S. v. L.M.S., 826 So.2d 178, 190 (Ala. Civ.App.2002) (plurality opinion), not to prevent the child from harming others. Nevertheless, we conclude that the same evidence proving that the parents possess adequate supervisory skills to protect the child from harming herself also proves that the parents can properly supervise the child to prevent her from harming others.

. The dissent reads into Dr. Finn's testimony the doctor’s "doubts that the mother could properly control the child’s behavior.” 70 So.3d at 1267 (Thomas, J., dissenting). If Dr. Finn doubted the ability of the mother to properly supervise the child, DHR could have clarified that opinion on cross-examination, keeping in mind its burden of proving dependency by clear and convincing evidence. However, DHR did not question Dr. Finn further on that point. We do not read Dr. Finn’s testimony as stating any opinion that the mother was incapable of properly supervising the child. Moreover, nothing in Dr. Finn’s testimony indicates that the father was incapable of properly supervising the child.

. The dissent also points out that the father testified that the mother was overwhelmed by the demands of home schooling the child and that she missed the final two days of trial, "in part because of her inability to cope with the additional stress of the proceeding.” 70 So.3d at 1267 (Thomas, J., dissenting). Actually, the father did not testify that the mother was incapable of protecting the child from harming herself; he simply testified that the mother could not handle home schooling a child with special needs and that the child was not benefiting enough from that form of education. The mother missed the last two days of the trial on the advice of her physician, who, in a letter to the judge that was entered as an exhibit at trial, stated that he was treating the mother for "inner ear disorder resulting in the loss of her equilibrium and vertigo. She is also manifesting significant anxiety and hypertension from prolonged stress....” However, DHR presented no evidence indicating that the mother suffered from any condition that would prevent her from adequately supervising the child.